1999 ME 107

**DAIGLE COMMERCIAL GROUP, INC.**

v.

**Raymond ST. LAURENT**

v.

**J.P. Maloney Auction Co., Inc.**

Supreme Judicial Court of Maine.

Argued April 6, 1999.

Decided July 9, 1999.

F. Jay Meyer, (orally), Thompson, Bull, Furey, Bass & MacColl, Portland, (for Raymond St. Laurent), for the appellant.

Robert W. Kline, (orally), Kline Law Offices, Portland, (for Daigle Commercial Group, Inc.), John D. Clifford, IV, (orally), Clifford & Golden, Lisbon Falls, (for J.P. Malone Auction Co.), for the appellees.

Before WATHEN, C.J., and RUDMAN, DANA, SAUFLEY,* ALEXANDER, and CALKINS, JJ.

DANA, J.

[¶ 1] Raymond St. Laurent appeals from a judgment of the Superior Court (Cumberland County, *Mills, J.*) in favor of Daigle Commercial Group, Inc., (Daigle, Inc.), a commercial real estate broker, on its action to recover brokerage fees on the basis of promissory estoppel. St. Laurent also appeals a summary judgment in favor of J.P. Maloney Auction Co., Inc., (Maloney, Inc.) on St. Laurent's claim for contribution or indemnity with respect to damages awarded Daigle, Inc. St. Laurent argues that the court erred (1) in applying the doctrine of promissory estoppel to allow a commercial broker to recover a brokerage fee, and (2) in granting a summary judgment for Maloney, Inc. on St. Laurent's claim for indemnification or contribution. We affirm the judgment.

---

* Saufley, J., sat at oral argument and participated in the initial conference but participated no further.

[¶ 2] In May 1995, Roger Daigle, president of Daigle, Inc., signed a non-exclusive listing agreement with David Green, the owner of Meadowbrook Village Shopping Center in York. Daigle found a buyer, St. Laurent, who purchased Meadowbrook from Green with an intention to "flip," or re-sell, the property. St. Laurent and Daigle then entered an exclusive right to sell agreement for Meadowbrook on September 14, 1995. This agreement provided that Daigle, Inc. maintained a right to sell until March 14, 1996. If Daigle, Inc. provided written notice to St. Laurent by March 14, 1996, of the persons whom it had contacted and one of those persons purchased the property before September 14, 1996, then Daigle, Inc. would be entitled to a commission of $75,000. The agreement further provided that if St. Laurent in "good faith" listed Meadowbrook by means of an exclusive right to sell agreement with another real estate brokerage agency after March 14, 1996, then the requirement to pay a broker's commission to Daigle, Inc. would be void.

[¶ 3] In October 1995, Carl Glidden, owner of the anchor tenant at Meadowbrook, terminated his lease. To find a new tenant, St. Laurent entered into an exclusive right to lease listing agreement with Commercial Properties, Inc., a real estate broker, but St. Laurent soon sought to terminate that lease listing agreement and he asked for Daigle's assistance in doing so. Daigle convinced Commercial Properties to release St. Laurent from the lease listing agreement, and the agreement was terminated March 7, 1996. St. Laurent then urged Daigle to continue his attempts to sell the Meadowbrook and to assist in finding tenants, and before the Daigle–St. Laurent agreement terminated on March 14, 1996, St. Laurent indicated to Daigle that he "had nothing to worry about in terms of [his] commission," and that as long as St. Laurent and Daigle were working together that St. Laurent "would protect [Daigle's] commission under any circumstances."

[¶ 4] On March 11, 1996, just after the termination of the Commercial Properties lease listing agreement and three days before the termination of the Daigle–St. Laurent agreement, St. Laurent entered into an exclusive right to lease listing agreement with The Kane Company, Inc. With respect to the termination of the Daigle–St.Laurent agreement, Daigle testified that:

> I asked Mr. St. Laurent for a new agreement and he indicated that he was going to bring on Kane ... to do the leasing and that typically in the leasing agreements there is a clause for potential sale and he wanted to keep his options open, that I had nothing to worry about in terms of my continued work at Meadowbrook, that I would always be protected and that I didn't have to worry about a commission, that he would never go around me, and that he wanted to keep his options open until the leasing took place so that the shopping center would be leased up and it would be attractive to buyers.

[¶ 5] Daigle received further assurances from St. Laurent after Daigle, pursuant to a separate agreement with St. Laurent, attempted to sell St. Laurent's mobile home park, Duck–A–Way. Daigle produced a potential purchaser of Duck–A–Way, but St. Laurent rejected the offer and found a buyer himself. Daigle, as the exclusive broker for the sale of Duck–A–Way, contended that St. Laurent owed him a $35,000 commission on the sale. To settle the dispute, Daigle and St. Laurent reached an agreement: (1) St. Laurent would pay Daigle a commission of $15,000, (2) Daigle, at St. Laurent's urging, would continue to attempt to sell Meadowbrook even though the brokerage contract had expired, and (3) St. Laurent would "make up the difference" in the Meadowbrook transaction.

[¶ 6] On March 28, 1996, after the termination of the Daigle–St. Laurent agreement, Daigle and David Andrews, the eventual purchaser of Meadowbrook, en-

tered into a non-disclosure agreement for Meadowbrook. In April, pursuant to that agreement, Daigle sent information to Andrews, including financial information about Meadowbrook and a professional summary appraisal. He engaged in discussions with Andrews, exchanged phone calls, and attempted to schedule a showing and meeting between St. Laurent and Andrews. Andrews drove by Meadowbrook on his own to view the property. According to Daigle, however, St. Laurent did not seem interested in pursuing Andrews as a potential purchaser.

[¶ 7] On April 22, 1996, St. Laurent entered into an exclusive right to sell listing agreement with Kane. Daigle was unaware of this agreement—he was only aware of the Kane *lease* agreement—and he therefore continued to ask St. Laurent to enter into a brokerage agreement. St. Laurent refused, but he did offer to exclude Daigle's prospects from the Kane lease agreement and Daigle therefore prepared a letter to St. Laurent listing Andrews as a potential buyer. St. Laurent then listed Andrews as an exclusion to Kane's exclusive right to *sell* agreement (not the lease agreement) providing that if St. Laurent sold Meadowbrook to Andrews, St. Laurent would not owe Kane a sales brokerage commission.

[¶ 8] On July 17, 1996, Daigle met with St. Laurent and again asked him to renew the exclusive right to sell agreement, but St. Laurent refused. Daigle testified that after he met with St. Laurent he was "being reassured . . . by Mr. St. Laurent that I did not have a thing to worry about on my commission, that he would never go around me, we had worked together for too long for him to consider doing anything like that." Daigle testified that after July 17, 1996, the level of contact between him and St. Laurent "wane[d] off" because he was "discouraged and disappointed" that St. Laurent was unwilling to sign an exclusive right to sell agreement.

[¶ 9] In late June or early July 1996, Andrews came in contact with Joseph Maloney of Maloney, Inc., a commercial broker, and they discussed a possible purchase of Meadowbrook. According to St. Laurent, Maloney then contacted St. Laurent with information that he had engaged in discussions with a "potential buyer," but he did not reveal the potential buyer's name. On July 18, 1996, St. Laurent—after terminating the Kane exclusive sales listing agreement on July 10—entered into an exclusive sales listing agreement with Maloney, Inc. Maloney testified that he told St. Laurent that Andrews was the potential purchaser only after the listing agreement was signed.

[¶ 10] On July 23, 1996, St. Laurent and Andrews signed a purchase and sale agreement for Meadowbrook. Maloney received a $72,000 commission. St. Laurent did not pay Daigle a commission.[1]

[¶ 11] In March 1997, Daigle, Inc. filed a complaint against St. Laurent alleging three counts: breach of contract, unjust enrichment, and promissory estoppel. St. Laurent answered the complaint and filed

---

1. St. Laurent's apparent reluctance to deal with Daigle must be examined in the context of a lawsuit filed by St. Laurent against Green that was pending during this time. In May 1996, St. Laurent filed a complaint against Green alleging that when he purchased Meadowbrook, Green knew that Glidden, the anchor tenant, was struggling financially and would not be able to renew his lease. The complaint alleges that Green misrepresented to St. Laurent that Glidden was "a good and stable tenant." St. Laurent sued for damages resulting from (1) the decline in value as a result of the loss of the anchor tenant, (2) lost rent that it would have received from Glid-

den, (3) damaged relationships with existing tenants because of the loss of the anchor tenant, and (4) expenses to mitigate these losses. Daigle, Inc. contends that St. Laurent, in an effort to increase his leverage in settlement negotiations with Green, may have sought to prevent Green from learning that St. Laurent was, in fact, close to finding a potential seller. Daigle, Inc. alleges that because Green was a client of Daigle's, St. Laurent limited communications with Daigle so as to keep Daigle from informing Green about the potential sale and jeopardize settlement negotiations. St. Laurent eventually settled with Green in August 1996 for $200,000.

a third-party complaint against Maloney, Inc. for contribution and indemnity. In December 1997, the court granted a summary judgment in St. Laurent's favor on Daigle, Inc.'s breach of contract claim. In March 1998, the court entered a summary judgment in favor of Maloney, Inc. on St. Laurent's third-party claim for contribution or indemnity.

[¶ 12] Following a bench trial, the court rejected Daigle, Inc.'s claims for breach of an oral contract and unjust enrichment, but entered judgment in favor of Daigle, Inc. on its promissory estoppel claim. The court concluded:

> [Daigle, Inc.] has proved by a preponderance of the evidence that [St. Laurent] continually told Roger Daigle that he should continue his efforts to market and lease Meadowbrook and that if he were successful in finding a buyer, he would receive a commission. [St. Laurent] reasonably expected that Roger Daigle would continue his efforts on behalf of [St. Laurent] and, in fact, Roger Daigle did continue those efforts. [St. Laurent's] promise should be enforced.

The court granted a judgment of $75,000 for Daigle, Inc. St. Laurent appealed the judgment and the court's order granting a summary judgment in favor of Maloney, Inc.

## I. PROMISSORY ESTOPPEL

[¶ 13] We review the court's findings of fact for clear error. *See Northeast Harbor Golf Club, Inc. v. Harris,* 1999 ME 38, ¶ 24, 725 A.2d 1018, 1025. The application of the law to the facts as found by the court is reviewed de novo. *See Paffhausen v. Balano,* 1998 ME 47, ¶ 5, 708 A.2d 269, 270–71.

[¶ 14] We have adopted the Restatement formulation of the doctrine of promissory estoppel:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce

such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*See Panasonic Communications & Sys. Co. v. State of Maine,* 1997 ME 43, ¶ 17, 691 A.2d 190, 195–96; Restatement (Second) of Contracts § 90(1) (1981). Promissory estoppel applies to promises that are "otherwise unenforceable." *See Panasonic Communications,* 1997 ME 43, ¶ 17, 691 A.2d 190, 196. Promissory estoppel, however, cannot be applied to avoid the statute of frauds requirement that all employment contracts for more than one year must be in writing. *See Popanz v. Peregrine Corp.,* 1998 ME 95, ¶ 6, 710 A.2d 250, 252; *Stearns v. Emery–Waterhouse Co.,* 596 A.2d 72, 74–75 (Me.1991).

[¶ 15] Here, St. Laurent argues that Daigle, Inc. cannot assert the doctrine of promissory estoppel to avoid the statutory requirement that certain brokerage contracts be in writing. *See* 32 M.R.S.A. § 13177 (1999). Title 32 M.R.S.A. § 13177 provides in relevant part:

> All exclusive right-to-sell contracts, exclusive agency contracts and any nonexclusive contract relating to one to 4 family residential properties shall be in writing, signed by the person to be charged and shall specifically identify the date upon which the contract will expire. If the parties to the contract desire to continue the contract, a new contract must be executed.

St. Laurent argues that this statute applies because if his promises to Daigle, Inc. created an agreement, it was an "exclusive agency" agreement or a continuation of a contract that requires a writing, and promissory estoppel cannot be asserted to avoid this statutory requirement. Because St. Laurent's promise did not require a writing pursuant to section 13177, we conclude that the court did not err when it applied the doctrine of promissory estoppel.

[¶ 16] An exclusive right to sell is when an owner "promises, in effect, that during the life of the contract he will not sell the property to any purchaser not procured by the listing broker." PAUL G. CRETEAU, MAINE REAL ESTATE LAW 353 (1969). An exclusive right to sell makes the broker the sole agent for the sale of the property, *id.*, and it "forbids the owner from selling his property without liability while the property is listed with the broker even if the latter cannot find a buyer," *Bourgoin v. Fortier*, 310 A.2d 618, 620 (Me.1973). On the other hand, a nonexclusive right, commonly referred to as an open listing, is characterized as follows:

> [A]n open listing merely amounts to an invitation to the broker to attempt to find a buyer. It is a "hiring" to be sure, but it is of the most flimsy type; it does not create a contractual relationship but approximates, rather, an offer by the owner which may be withdrawn by him at any time. And it leaves the owner free to list the property with other brokers, or to make a sale himself. In fact the very reason an owner gives an open listing is usually to afford himself the opportunity of selling the property through his own efforts, while at the same time keeping the sale "open" to the efforts of other brokers.

CRETEAU, MAINE REAL ESTATE LAW 350. Here, the court did not expressly determine the type of listing agreement that St. Laurent's promises to Daigle, Inc. created.

[¶ 17] Because St. Laurent's promises created an "open" or nonexclusive listing that does not require a writing, section 13177 does not apply. A real estate expert testified that St. Laurent's promise created an "open listing," which is common in commercial real estate transactions where brokers often operate on verbal agreements. *See* 32 M.R.S.A. § 13177; Comm. Amend. A to L.D. 1200, No. S–224 (109th Legis.1979). In this case, St. Laurent sought and utilized multiple brokers to sell Meadowbrook, consistent with an "open listing" which generally provides that the owner and multiple brokers—not just one broker—will pursue sales opportunities. *See* CRETEAU, MAINE REAL ESTATE LAW 350. For example, St. Laurent told Daigle that he wanted the option to sell Meadowbrook through Kane if the opportunity arose, and St. Laurent later listed Andrews as an exclusion to Kane's exclusive right to sell agreement. Because St. Laurent's promises were consistent with an open listing, a written contract was not required under section 13177 and the court's application of promissory estoppel did not frustrate the writing requirement. *See* 32 M.R.S.A. § 13177.

[¶ 18] Given that section 13177 does not preclude the application of promissory estoppel, the court did not err when it applied promissory estoppel to enforce St. Laurent's promise. St. Laurent made promises which he should have reasonably expected to induce action by Daigle, Inc. *See Panasonic Communications*, 1997 ME 43, ¶ 17, 691 A.2d 190, 195–96; RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981). For example, the court found that in mid-March 1996—around the time the Daigle–St.Laurent agreement terminated—St. Laurent told Daigle to continue his efforts to sell Meadowbrook and to lease the space vacated by the anchor tenant. In April 1996, St. Laurent told Daigle that he would continue to use Daigle to sell Meadowbrook and that Daigle "would realize on the sale of Meadowbrook anything that he lost on the sale of Duck–A–Way." The court further found that St. Laurent assured Daigle that he would be "protected" regarding any sale of Meadowbrook and that St. Laurent "would not go around" Daigle. Daigle reasonably relied on these promises to his detriment—he pursued Andrews as a potential purchaser, exchanged telephone calls and had several discussions with Andrews, showed the property to several prospects and attempted to arrange a showing of Meadowbrook to Andrews, and provided Andrews with

financial information and a professional summary appraisal. *See Nappi v. Nappi Distrib.,* 1997 ME 54, ¶ 9, 691 A.2d 1198, 1200 (promise enforceable on theory of promissory estoppel where promisee made substantial improvement on land in reliance on promise to convey the land). Consequently, the court did not err when it concluded that promissory estoppel required the enforcement of St. Laurent's promise.[2]

## II. DAIGLE'S PERFORMANCE AS BROKER

[¶ 19] The court characterized the promise as follows: "St. Laurent continually told Roger Daigle that he should continue his efforts to market and lease Meadowbrook and that if he were successful in finding a buyer, he would receive a commission." St. Laurent argues that even if this promise is enforceable based on a theory of promissory estoppel, Daigle was not the "effective and producing cause" of the sale to Andrews and he therefore failed to "find a buyer" as contemplated by St. Laurent's promise. We disagree.

[¶ 20] The court never explicitly determined if either Daigle or Maloney was the effective and producing cause of the sale. Because St. Laurent failed to move for further findings of fact pursuant to M.R. Civ. P. 52 on this issue, we may assume that the court found that Daigle was, in fact, the effective and producing cause of the sale and we review the record to determine whether this finding is supported by the evidence in the record. *See Estate of Saliba v. Dunning,* 682 A.2d 224, 226 (Me. 1996); *Smile, Inc. v. Moosehead Sanitary Dist.,* 649 A.2d 1103, 1106 (Me.1994).

[¶ 21] The court's implied finding that Daigle was the effective and producing cause of the sale was not clearly erroneous. *See Bedard v. Pellon,* 606 A.2d 205, 207 (Me.1992). Daigle introduced Andrews to the Meadowbrook property in March 1996 and entered into an non-disclosure agreement for its sale. In April 1996, Daigle sent information regarding Meadowbrook to Andrews, including financial information and a professional summary appraisal. Daigle engaged in numerous discussions with Andrews, exchanged a number of phone calls with him to discuss Meadowbrook, and communicated Andrews's interest to St. Laurent. In May 1996, when St. Laurent expressed doubts about Andrews's ability to make a purchase, Daigle investigated Andrews's financial background, communicated that to St. Laurent, and convinced St. Laurent that Andrews was a viable candidate to purchase Meadowbrook. During this time, Andrews viewed the property on his own even though Daigle offered to show it to him. About two months later, Andrews purchased Meadowbrook. We conclude that the court did not err in its assumed finding of fact that Daigle was the effective and producing cause of the sale.

## III. DAMAGES

[¶ 22] St. Laurent argues that the judgment for Daigle, Inc. is excessive. The court awarded damages of $75,000, the amount of the brokerage fee set forth in the written agreement. We conclude that the court did not err in awarding damages.

[¶ 23] The court's award of expectation damages is reasonable. "A promise binding under [promissory estoppel] is a con-

2. St. Laurent argues that Daigle, Inc. cannot recover under the doctrine of promissory estoppel because the Daigle–St. Laurent agreement governed their mutual rights and obligations. Even assuming, without deciding, that Daigle, Inc. could not recover under promissory estoppel if a contract governed the actions at issue, the contract is not a bar to recovery here because it terminated March 14, 1996, and was not renewed. Consequently, St. Laurent's subsequent promises to Daigle that he "would always be protected" and that Daigle "didn't have to worry about a commission," and Daigle's subsequent reliance on those promises, gave rise to a theory of recovery on the basis of promissory estoppel.

tract, and full-scale enforcement by normal remedies is often appropriate." RESTATE-MENT (SECOND) OF CONTRACTS § 90 cmt. d (1981). Here, the court's award of the $75,000 brokerage fee represented Daigle's expectation damages, and this measure of damages was not error.

## IV. CONTRIBUTION AND INDEMNIFICATION

[¶ 24] St. Laurent argues that the court erred in granting a summary judgment on St. Laurent's claim in favor of Maloney, Inc. for equitable indemnification or contribution with respect to any brokerage fee owed Daigle, Inc. We disagree.

[¶ 25] Both the Maloney–St. Laurent agreement and the Daigle–St. Laurent agreement provided that the broker could enter into a co-brokerage agreement. In his opposition to the summary judgment, St. Laurent alleged, inter alia, that (1) when the Daigle–St. Laurent

agreement was in force, Roger Daigle informed Maloney that Daigle, Inc. was listing Meadowbrook and encouraged a "co-brokerage agreement," (2) St. Laurent listed the property with Maloney after the Daigle–St. Laurent agreement expired, and (3) Maloney failed to identify Andrews's identity to St. Laurent even though Maloney knew that Andrews was already familiar with Meadowbrook. Although St. Laurent conceded that Maloney did not have any fault or commit misconduct, he alleges that Maloney "was on notice of facts suggesting that Daigle might have and assert a competing claim for a commission, which facts include . . . the existence of Daigle's prior listing, Daigle's invitation for Maloney to co-broke, and Mr. Andrews' preexisting familiarity with Meadowbrook." On these facts, the court granted a summary judgment for Maloney, Inc.[3]

[¶ 26] The doctrine of equitable contribution requires that when parties as-

3. On appeal, St. Laurent also argues that a summary judgment was inappropriate because of additional facts, adduced at trial, that Andrews disclosed to Maloney his prior involvement with Daigle. Although St. Laurent never moved for reconsideration of the summary judgment after that evidence was introduced at trial, he alleges that the court erred when it failed to *sua sponte* revise the summary judgment.

Rule 54(b)(1) of the Maine Rules of Civil Procedure provides in relevant part:
[W]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct entry of a final judgment as to one or more but fewer than all of the claims or parties . . . . [A]ny order or other form of decision . . . which adjudicates less than all the claims or the rights and liabilities of less than all the parties shall not terminate the action as to any of the claims or parties, *and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.* (Emphasis added.) *See Monopoly, Inc. v. Aldrich,* 683 A.2d 506, 509–10 (Me.1996). "Rule 54 requires no motion by a party before an order adjudicating

less than all claims and rights may be revised." *Id.* at 510. Here, although the court could have revised the summary judgment for Maloney, Inc., the court did not err in not doing so. We note that although M.R. Civ. P. 54 does not require a motion by a party before an order adjudicating less than all claims may be revised, *id.,* a party seeking a reconsideration of a motion for a summary judgment on the ground that evidence adduced at trial supports a revision should file a motion with the trial court. *Cf. id.* at 509–10 (court reconsiders a partial summary judgment when moving party filed motion for reconsideration). St. Laurent failed to do so here, and the court did not abuse its discretion in failing to revise the summary judgment order.

Finally, in reviewing the court's order, we will consider only those facts before the court at the time it ruled on the motion for a summary judgment. *See Emerson v. Sweet,* 432 A.2d 784, 785 (Me.1981) ("On appellate review, the evidence before the Superior Court must be examined to insure that the substantive law was correctly applied to that evidence in the context of a summary judgment motion ."). Moreover, even if the court considered that Andrews told Maloney that he had previously worked with Daigle on the purchase of the Meadowbrook property, summary judgment was still appropriate.

sume a common obligation, those parties must share equally that obligation and burden. *See Bragdon v. Worthley,* 155 Me. 284, 288–89, 153 A.2d 627, 629–30 (1959). Indemnity is appropriate "to do justice within the law so that one guilty of an active or affirmative act of negligence or intentional act will not escape liability, while another whose fault was only technical or passive assumes complete liability." *Northeast Bank of Lewiston & Auburn v. Murphy,* 512 A.2d 344, 351 (Me.1986) (quoting 41 AM. JUR. 2D *Indemnity* § 20, at 706 (1968))..

[¶ 27] The court did not err in entering a summary judgment on St. Laurent's claims against Maloney, Inc. First, with respect to the claim for contribution, no common obligation existed between St. Laurent and Maloney, Inc. to require Maloney, Inc. to share any burden or liability arising to Daigle. *See Bragdon,* 155 Me. at 288–89, 153 A.2d at 629–30. To the extent that St. Laurent alleges that a common obligation existed between Maloney, Inc. and Daigle, such a common obligation would not give rise to a claim for contribution by St. Laurent. Second, with respect to the claim for indemnity, Maloney did not commit an affirmative act of negligence that gives rise to a duty to indemnify—Maloney's knowledge that St. Laurent and Daigle once had a listing agreement and Maloney's failure to reconcile the possible conflict did not create such a duty. *See Northeast Bank of Lewiston & Auburn,* 512 A.2d at 351. Moreover, the co-brokerage provisions in the contracts here only permit the broker to arrange a co-brokerage agreement, these provisions do not require the broker to indemnify another broker. *See id.* Consequently, the court did not err when it granted a summary judgment in favor of Maloney, Inc.

The entry is:

Judgment affirmed.

