**Richard LARSON, Plaintiff,**

v.

**Edward C. JOHNSON et al., Defendants.**

**No. 01–CV–59–B–S.**

United States District Court, D. Maine.

Feb. 5, 2002.

Frank T. McGuire, John W. McCarthy, Rudman & Winchell, Bangor, ME, for Richard W Larson.

Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, ME, for defendants.

## ORDER

SINGAL, District Judge.

Plaintiff brought suit seeking to force Defendants to pay fees and wages they allegedly owed him for work he performed on a construction project. Presently before the Court is Defendants' Motion for Summary Judgment (Docket # 14). For the following reasons, the Court GRANTS IN PART and DENIES IN PART the Motion.

## I. SUMMARY JUDGMENT STANDARD

The Court will grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" if it could be resolved in favor of the nonmoving party by a rational jury drawing reasonable inferences. *See, e.g., Ward v. Massachusetts Health Research Inst.,* 209 F.3d 29, 32 (1st Cir.2000). A fact is "material" if it could affect the outcome of the case under governing law. *See, e.g., Hinchey v. NYNEX Corp.,* 144 F.3d 134, 140 (1st Cir.1998).

At summary judgment, the court views the facts in the light most favorable to the nonmoving party. *See, e.g., Kearney v. J.P. King Auction Co.,* 265 F.3d 27, 33 (1st Cir.2001). When the facts support plausible but conflicting inferences on a pivotal issue in the case, a court may not choose between those inferences, but must leave the conflict to the jury to resolve. *See*

*Iglesias v. Mutual Life Ins. Co.*, 156 F.3d 237, 240 (1st Cir.1998).

## II. BACKGROUND

Plaintiff Richard Larson and Defendant Edward C. Johnson were friends and business acquaintances for nearly thirty years. In 1995, Johnson asked Larson to supervise a construction project located on Mount Desert Island, Maine (the "house project"). Defendant ECJ Long Pond Property Trust ("ECJ"), a nominee trust of which Johnson was the beneficiary, owned the land on which the construction took place.[1]

Although they had no written contract, Larson agreed to take on the project at a rate of pay of $6,700 per month, calculated as a percentage of the total estimated cost of the project divided into monthly payments, plus lodging in a cottage located at the construction site. As project manager and general contractor, Larson was responsible for myriad tasks on the site including liaising with subcontractors, discussing design details with the architect, and providing regular progress reports to Johnson. Defendant Strategic Advisors ("SA"), through a subsidiary known as Crosby Advisors, paid Larson's monthly wage.

Sometime during the house project, ECJ, on behalf of Johnson, purchased a house and property on Mount Desert Island that became known as "Prays Meadow." Johnson permitted Larson to move from the construction site cottage into Prays Meadow.

At the termination of the house project in the spring of 1997, Johnson offered Larson a bonus for his work. After discussing and rejecting an arrangement by which Larson would take an ownership interest in Prays Meadow, they settled upon a $175,000 cash payment. Johnson also convinced Larson to remain at Prays Meadow on a continuing basis, rent-free, in exchange for looking after Johnson's property interests on Mount Desert Island and elsewhere in Maine. Larson stayed on at Prays Meadow with the understanding that Johnson could, at any time, evict him.

Between January 1998 and late summer 1999, Larson lived at Prays Meadow and "earned his keep" by performing various tasks for Johnson. Then, in late summer 1999, Johnson began preparations for another building project to construct a workshop on property located near the house project site (the "shop project"). Defendant Northern Neck Nominee Trust ("NN"),[2] of which Johnson was the beneficiary, owned the land. Johnson initially asked Larson to help with the shop project, but when Larson asked to be paid at his former rate, Johnson balked because he had already hired a project manager. They did not reach an agreement and Larson declined to lend his assistance.

In November 1999, Johnson again asked for Larson's help. The parties disagree as to what transpired next. Larson contends that, as before, he asked Johnson to pay him $6,700 per month for his services (in addition to his continued use of Prays Meadow). Johnson responded that he would "take care of" Larson if he would do the project, and told him to "trust the

---

**1.** The trustee of ECJ, Patricia Hurley, is a nominal Defendant in this action as Trustee of ECJ. For simplicity's sake, the Court will refer to the party as ECJ, rather than Hurley, because Hurley is also an employee of Defendant Strategic Advisors, and a trustee of Defendant Northern Neck Nominee Trust.

**2.** See note 1, *supra*. In addition to Hurley, Jeffrey P. Resnick is also a nominal Defendant in this action as a second trustee of NN.

Great Oracle" (meaning Johnson). (*See* Plaintiff's Reply Statement of Material Facts ("PRSMF") ¶ 56 (Docket # 19).) In return, Johnson asked only that Larson tell Patricia Hurley, a manager of Crosby Advisors and trustee of ECJ and NN, that he was taking on the project "pro bono." (*See* PRSMF ¶ 58.) Larson placed the call to Hurley. However, he insists that he understood from his conversation with Johnson that he would be paid at least the sum he had been paid for the previous job, although the form of the payment would be subject to Johnson's "whim." (*See* Larson Dep. at 185–86.)

Johnson tells a different story. According to him, he asked Larson to take on the shop project as a favor and in consideration for continued rent-free use of Prays Meadow. He admits that he refused to pay Larson at his former rate, but adds that he offered to pay Larson $4,700 per month, which approximated Larson's salary for the house project less a $2,000–per-month credit for rent at Prays Meadow. Larson refused this offer, according to Johnson, but ultimately agreed to take the job on "pro bono" in a capacity that would not increase the amount of work he had already been performing for Johnson in exchange for occupying the house. Johnson acknowledges that he told Larson that he would "take care of" him, but contends that both he and Larson understood that statement to mean that Johnson could compensate Larson as much, or as little, as Johnson wished at the end of the project.

Larson's involvement with the shop project began in earnest in late November 1999. By his own estimation, he spent roughly forty percent less time on it than he had on the previous job. This reduction in work responsibility was due primarily to the fact that Larson did not serve as the general contractor on the shop project, but only assumed project manager duties.

He nevertheless performed a wide range of tasks on and off the construction site. In particular, he attended regular construction meetings at which he served as the moderator, discussed design ideas with the architect and landscape architect, and assumed supervisory duties over various stages of the construction.

In March 2000, Larson asked Hurley for payment for his work. Hurley informed him that she did not believe that he was to be paid. Larson continued working on the project, and one month later made the same request to Johnson for "something on account." (Defendant's Statement of Material Facts ("DSMF") ¶ 70 (Docket # 15).) Johnson instead offered Larson a loan, which Larson rejected. Larson nonetheless continued to work on the project until August 2000, when he again asked Johnson to pay him. In response, Johnson terminated Larson's participation on the project and asked him to vacate Prays Meadow. Larson complied. There appears to be no dispute that Larson added some value to the shop project, and that Johnson was satisfied with the end result.

Roughly one year later, Larson filed a complaint against Johnson, SA, ECJ and NN in this Court alleging fraudulent misrepresentation (Count I); negligent misrepresentation (Count II); breach of contract (Count III); breach of a Maine wage payment statute, 26 M.R.S.A. § 626 (Count IV); promissory estoppel (Count V); quantum meruit (Count VI); unjust enrichment (Count VII); and recovery and accounting for a joint venture (Count VIII). Johnson counterclaimed for payment of bills outstanding on work performed at Prays Meadow during Larson's tenancy. Johnson then filed a motion for summary judgment as to all of the counts.

## III. DISCUSSION

Although the record is voluminous, at heart this case involves a simple dispute.

Plaintiff and Defendants disagree over whether Defendant Johnson promised to pay Plaintiff for Plaintiff's work on the shop project. Plaintiff insists that the statements "[I will] take care of [you]" and "trust the Great Oracle" represented a commitment on Defendants' behalf to pay him. Defendants insist that they did not because Plaintiff understood all along that he would not be paid. Seeking compensation for the work he performed, Plaintiff asserts a variety of legal theories, the first group of which is grounded in contract and equity principles, the second in tort law, and the last in statutory text.

## A. Contract and Equity Claims

For the first group of claims, the Court addresses in various contexts whether a reasonable person in Plaintiff's shoes could have heard Defendant Johnson's statements and expected payment as a result.

### 1. Breach of Contract

■ "To establish a legally binding agreement the parties must have mutually assented to be bound by all of its terms; the assent must be manifested in the contract ... and the contract must be sufficiently definite to enable the court to determine its meaning and fix exactly the legal liabilities of the parties." *Stanton v. Univ. of Maine Sys.*, 773 A.2d 1045, 1050 (Me.2001) (internal citations omitted). To survive summary judgment on his breach of contract claim, Plaintiff must establish a genuine issue of material fact as to whether Defendant Johnson's statements "[I will] take care of [you]" and "trust the Great Oracle" committed Defendants to pay him a specific amount of money— $6,700 per month or its equivalent—in exchange for his assistance with the shop project. A reasonable jury need not find that the promise to pay was explicit, necessarily. *Id.* The terms of a contract may be implied from the facts and circumstances of its formation, provided they are sufficiently defined for the Court to be able to enforce them. *Id.* The Court first addresses whether Defendant Johnson bound himself with these statements, and then considers whether he bound the remaining Defendants with them.

### a. Defendant Johnson

■ After reviewing the record, the Court concludes that there is ample evidence to allow a rational jury to conclude that Defendant Johnson promised to pay Plaintiff an amount equivalent to his wage on the house project in exchange for his assistance with the shop project. The context in which the statements were made is telling. Plaintiff alleges that Defendant Johnson made them in response to Plaintiff's repeated demands for $6,700 per month, and only after Plaintiff initially refused to assist with the project if he would not be paid. It is reasonable to infer from these circumstances that a promise to "take care of" Plaintiff expressed or implied intent to pay him the requested amount.

■ Defendant Johnson first objects that an agreement to pay a specific amount, but in a form to be decided at Defendant Johnson's "whim," is illusory. It is true that the "reservation to either party of an unlimited right to determine the nature and extent of his performance" renders the obligation too indefinite to be enforceable. *Corthell v. Summit Thread Co.*, 132 Me. 94, 167 A. 79, 81 (1933). However, this is not such a case. The Court could enforce an agreement in which the form, or nature, of payment is left to one party's discretion, provided the amount, or extent, of payment is fixed. *See generally,* Restatement (Second) of Contracts § 34(1) (1979) ("The terms of a contract may be reasonably certain even

though it empowers one or both parties to make a selection of terms in the course of performance.")

 Defendant Johnson next counters that even if his behavior objectively suggested the intent to be bound to specific terms, the contract was within the Statute of Frauds, 33 M.R.S.A. § 51(5), and therefore is invalid since it was never reduced to writing. When it appears to have been understood by the parties to an oral contract that it was not to be performed within a year is the contract within the Statute of Frauds. *Id.; see also, White v. Fitts,* 102 Me. 240, 66 A. 533, 535 (1906). Plaintiff contends, however, that in this case it was certainly *possible* to perform the contract within a year, and there is no evidence on the record supporting the conclusion that the parties understood, at the time the contract was made, that performance would last for a longer period. Because it is Defendant Johnson's burden on summary judgment to point to specific facts supporting this affirmative defense, *see, e.g., In re Varrasso,* 37 F.3d 760, 763 (1st Cir.1994), and he has not done so, his argument must fail.

Although there are also facts on the record tending to suggest that Plaintiff knew, at the time Defendant Johnson made the statements, that the shop project work would require less effort and would consume less time than the first project, those facts do not wholly negate the evidence Plaintiff has offered in support of his argument. Plaintiff's interpretation of the statements is reasonable, as is Defendant's. The Court is bound to allow a jury to decide between them. *See Iglesias,* 156 F.3d at 240. Summary judgment on Plaintiff's breach of contract claim as to Defendant Johnson is therefore inappropriate.

### b. Remaining Defendants

 The remaining Defendants argue that they could not have been bound under any conception of the agreement between the parties, because no reasonable jury could understand Defendant Johnson's statements as expressing an obligation on the other Defendants' part to be bound to pay Plaintiff for his services. This argument has merit. Plaintiff has demonstrated no facts that could lead a rational jury to conclude that Defendant Johnson's statements expressed a commitment on the part of SA, ECJ or NN to be bound. Indeed, by having Plaintiff tell Hurley that he would be working without compensation, Defendant Johnson appeared to exclude SA and the trusts from any agreement he had with Plaintiff. Significantly, as of March 2000, Hurley, a manger of CA and trustee of both trusts, was not aware of any payment arrangement between Plaintiff and Defendant Johnson whatsoever. Summary judgment on the remaining Defendants' behalf is therefore appropriate on this claim.

### 2. Promissory Estoppel

Plaintiff alternatively claims that even if his agreement with Defendant Johnson was not enforceable, he is entitled to recover from Defendants pursuant to the doctrine of promissory estoppel:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Daigle Commercial Group, Inc. v. St. Laurent,* 734 A.2d 667, 672 (citing Restatement (Second) of Contracts § 90(1) (1981)). To survive summary judgment on this claim as to Defendant Johnson, Plaintiff need first demonstrate facts showing that Defendant Johnson's statements constituted a promise that could reasonably have been

expected to prompt Plaintiff to work on the shop project. For the same reasons that the Court finds that Plaintiff's breach of contract claim against Defendant Johnson survives, the Court concludes that this claim, also, is viable. Plaintiff has demonstrated facts sufficient to establish a genuine issue as to whether Defendant Johnson promised to pay him.

 There is also a genuine dispute as to whether Defendant Johnson's statements induced Plaintiff's action; Plaintiff claims it did, whereas Defendant Johnson argues that Plaintiff took on the shop project to earn his keep at Prays Meadow. Finally, there is a genuine issue as to whether it would be unjust not to hold Defendant Johnson to his alleged promise. Therefore, Plaintiff's promissory estoppel claim against Defendant Johnson must survive.

Plaintiff may *not*, however, pursue a claim for promissory estoppel against the remaining Defendants SA, ECJ or NN, because Plaintiff has failed to establish a genuine issue of material fact whether Defendant Johnson's statements committed those Defendants to compensating him.

### 3. Quantum Meruit

 The resolution of Plaintiff's claim for payment on the basis of quantum meruit, or implied contract, also relies upon the Court's conclusion that Defendant Johnson's statements can reasonably be construed as a promise. "A valid claim in quantum meruit requires that: (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Howard & Bowie, P.A. v. Collins,* 759 A.2d 707, 711 (Me.2000) (internal citations omitted). The first two elements of quantum meruit appear to be uncontested in the record.

To survive summary judgment on this claim against Defendant Johnson, Plaintiff must only show that it was reasonable for him to expect payment because of Defendant Johnson's statements. Because the Court holds that a rational jury could conclude that Defendant Johnson bound himself in contract to paying Plaintiff a specific sum, it follows that a rational jury could find that Plaintiff was justified in expecting payment under the circumstances.

 Plaintiff's expectation of payment from remaining Defendants SA, ECJ and NN was not reasonable, however, in that Defendant Johnson excluded those entities from his alleged arrangement with Plaintiff. No rational jury could find that, under the circumstances, Plaintiff could have reasonably expected compensation from any of the other Defendants.

### 4. Unjust Enrichment

 Plaintiff next argues that he is entitled to recover from Defendants pursuant to the equitable doctrine of unjust enrichment. A defendant is unjustly enriched when (1) a benefit is conferred upon him by the plaintiff; (2) the defendant knows of or appreciates the benefit conferred; and (3) the defendant accepts or retains the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *See, e.g., Aladdin Elec. Assocs. v. Town of Old Orchard Beach,* 645 A.2d 1142, 1144 (Me.1994). Although the terms are often mistakenly used interchangeably, unjust enrichment differs from quantum meruit in that the latter refers to the compensation that is due a plaintiff under a theory of implied contract, whereas the former assumes that there was no contractual relationship between the parties. *Id.* at 1145.

■ Plaintiff has adduced sufficient facts to show that he conferred a benefit upon Defendant Johnson as beneficial owner, and Defendant NN as legal owner, of the shop property. Plaintiff has also established that Defendant Johnson and Hurley, the trustee of NN, knew of or appreciated the benefit that Plaintiff conferred. Finally, as discussed above, Plaintiff has demonstrated sufficient facts to create a genuine issue of material fact as to whether "fairness and justice" require Defendants Johnson and NN to pay for the benefit. *Id.*

■ On the other hand, Plaintiff has not established facts sufficient to show that SA or ECJ benefited from his services. SA is merely the corporate parent of CA, which paid Plaintiff for his house project services, and did not obviously benefit from Plaintiff's advisory services on the shop project. By the same token, ECJ is the owner of the original construction property and Prays Meadow. Plaintiff alleges no facts showing a benefit that flowed to this entity from Plaintiff's shop project work. Rather, he merely claims that it benefited indirectly. Without more, summary judgment is appropriate on behalf of Defendants SA and ECJ on this claim.

## B. Plaintiff's Tort Claims

Plaintiff also seeks payment for his services on the shop project via available tort remedies. The Court addresses each below.

### 1. Fraudulent Misrepresentation

■ Plaintiff first claims that Defendants fraudulently misrepresented their intent to pay him. Fraudulent misrepresentation can be demonstrated by showing (1) a misrepresentation of material fact, (2) with knowledge of its falsity or in reckless disregard of whether it was true or false;

and (3) reasonable reliance by Plaintiff on the misrepresentation to [his] detriment. *See Barnes v. Zappia,* 658 A.2d 1086, 1089 (Me.1995). Because this is a claim for fraud, a plaintiff must show that each of these elements was "highly probable." *Francis v. Stinson,* 760 A.2d 209, 217 (Me. 2000).

■ The heightened evidentiary standard is Plaintiff's undoing. To demonstrate that Defendant Johnson made a false statement, Plaintiff initially must show that it is highly probable that Defendant Johnson's statements comprised a promise to pay him. Plaintiff has failed to clear this first hurdle. Although the Court concludes above that Plaintiff's interpretation of "[I will] take care of [you]" and "trust the Great Oracle" as a promise to pay him was reasonable, it cannot take the additional leap necessary to find that Plaintiff has shown, to *a high degree of probability,* that his interpretation was correct. Thus, Plaintiff has failed to demonstrate the first element of a claim for fraudulent misrepresentation, and his claim cannot succeed.

### 2. Negligent Misrepresentation

Alternatively, Plaintiff alleges that Defendant Johnson's statements amounted to negligent misrepresentation. To survive summary judgment on this claim, Plaintiff must raise a genuine issue of material fact as to whether (1) Defendants had a pecuniary interest in securing Plaintiff's help with the shop project; (2) they supplied Plaintiff with false information for his guidance in deciding whether to provide his services to the project; (3) they did so without exercising reasonable care or competence; and (4) their actions caused Plaintiff a loss due to his justifiable reliance on the information. *See, e.g., Binette v. Dyer Library Ass'n,* 688 A.2d 898, 903 (Me.1996) (quoting *Restatement (Second)*

*Torts,* § 522(1) (1977)). Because Plaintiff's theory of liability as to Defendant Johnson differs from his theory as to the remaining Defendants, the Court addresses them separately.

### a. Defendant Johnson

 Plaintiff alleges that even if Defendant Johnson did not intend to pay Plaintiff, he failed to exercise reasonable care when he informed Plaintiff of that fact, leaving Plaintiff with the erroneous, but reasonable, impression that he would be paid for his shop project work. There is no disagreement that Defendant Johnson had a pecuniary interest in securing Plaintiff's participation in the shop project. The parties disagree, however, over whether Defendant Johnson provided Plaintiff with false information. As before, Plaintiff must demonstrate that the statements expressed Defendant Johnson's intent to pay him for his shop project work. In contrast to a fraudulent misrepresentation claim, however, the elements of negligent misrepresentation need not be shown to a high degree of probability. *Compare Barnes,* 658 A.2d at 1089 *with Binette,* 688 A.2d at 901. Thus, it is sufficient for Plaintiff to show, as he has, that there is a genuine issue of material fact as to whether the statements represented a promise. *See Binette,* 688 A.2d at 901–03. Moreover, for the same reasons a jury could conclude that Defendant Johnson promised to pay Plaintiff, it could also find that Defendant failed to exercise reasonable care in making the statements, even if he intended to limit his obligation to pay Plaintiff.

Defendant Johnson nevertheless challenges Plaintiff's ability to establish the fourth element of the claim, arguing that Plaintiff could not have justifiably relied on the statements because Plaintiff admitted at deposition that he understood, when he took on the shop project, that Defendant Johnson's "whim" would dictate what compensation he would receive. Defendant Johnson mischaracterizes Plaintiff's remarks, however. Plaintiff stated only that he believed the *form* of his compensation would be determined at Defendant Johnson's whim,[3] but that the *amount* of compensation would approximate his former rate of pay. (*See* Larson Dep. at 185–86). A rational jury could find this belief to be justifiable, given the prior dealings between the parties and Plaintiff's prior insistence that he be compensated.

Defendant Johnson further objects that twice before Defendant Johnson asked him to quit the project, Plaintiff requested payment and was told he would not be paid. The first instance occurred in March 2000, when Plaintiff asked Hurley for a payment and Hurley told him she did not believe he would be paid. The second occurred a month later, when Defendant Johnson offered him a loan in response to his request for "something on account." Defendant Johnson argues that after each of these instances, Plaintiff was no longer justified in relying upon the statements made in November 1999.

The Court does not agree. A reasonable jury could find that Plaintiff justifiably relied on Defendant Johnson's alleged promise even after Hurley told him he would not be paid, because Plaintiff himself had told Hurley, purportedly at Defendant Johnson's request, that he was taking on the shop project pro bono. A rational jury could find that it was reasonable for Plaintiff not to expect Hurley to know the

---

**3.** Plaintiff contends that cash or an ownership interest in Prays Meadow, among others, were possible forms of compensation.

"true" payment arrangement he had with Defendant Johnson. By the same token, a reasonable jury could find that Defendant Johnson's offer of a loan did not necessarily indicate that payment was not forthcoming. A loan could as easily have represented an advance against Plaintiff's future earnings as it could have been a flat-out rejection of Plaintiff's request for payment. There are genuine issues of material fact as to all of the elements of Plaintiff's negligent misrepresentation claim, and therefore summary judgment on this claim for Defendant Johnson is not appropriate.

### b. Defendants SA and ECJ

Plaintiff also presses his negligent misrepresentation claim against Defendants SA (the corporate parent of CA, which had formerly paid Plaintiff his wages) and ECJ (the owner of Prays Meadow and the first construction project property).[4] Plaintiff alleges that these entities are liable to him because they indirectly benefited from the work he performed on the shop project, and misrepresented their intent not to compensate him by silently acquiescing to his participation.

■ Assuming for the moment that Plaintiff has shown that Defendants SA and ECJ had a pecuniary interest in Plaintiff's shop project work, Plaintiff has failed to demonstrate that they supplied him with false information. For the purposes of a negligent misrepresentation claim, silence may be interpreted as a misrepresentation if the party who remains silent is under a statutory duty to disclose information to a plaintiff. *See Binette*, 688 A.2d at 903. Here, Plaintiff argues that pursuant to 26 M.R.S.A. § 629, Defendants SA and

ECJ had the duty not to allow him to work without compensation.[5] That duty, according to Plaintiff, encompassed the affirmative responsibility to inform Plaintiff that he would not be compensated for his work.

■ Maine courts have never read into section 629 an affirmative obligation to inform persons that they are working without pay. In the handful of times it has been construed, the statute has only been interpreted as a measure to prohibit employers from forcing employees to work knowingly without pay in order to secure or retain future employment. *See, e.g., Cooper v. Springfield Terminal Ry. Co.,* 635 A.2d 952 (Me.1993) (railroad could not require employees to qualify for certain new positions by training without pay). The statute contains no affirmative notice requirement, and did not require Defendants SA and ECJ to inform Plaintiff of his pro bono status. Plaintiff's claim against them therefore is without merit.

### C. Maine Wage Payment Statute Claim

Plaintiff further argues that, as an employee of Defendants, he is entitled to unpaid wages pursuant to Maine statute, 26 M.R.S.A. § 626. The statute, in relevant part, provides that

> An employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer ... For purposes of this section, the term "employee" ... does not include an independent contractor.

26 M.R.S.A. § 626. Defendants argue that, to the extent a contract existed between Plaintiff and Defendants, Plaintiff

---

4. Plaintiff has not filed a claim against the NN trust for negligent misrepresentation.

5. In relevant part, the statute reads:

> No person, firm or corporation shall require or permit any person as a condition of securing or retaining employment to work without monetary compensation...
> 26 M.R.S.A. § 629.

was an independent contractor, not an employee.

■ Since the Maine Law Court's ruling in *Murray's Case*, 130 Me. 181, 154 A. 352 (1931), Maine courts have recited the general precept that an employer's "right to control" the worker determines the employment relationship. *Id.* at 354; *Taylor v. Kennedy*, 719 A.2d 525, 527–28 (Me. 1998); *Marston v. Newavom*, 629 A.2d 587, 591 (Me.1993). Eight factors, in particular, suggest that a worker is an independent contractor rather than employee. They are (1) the existence of a contract for the performance by the worker of a certain piece or kind of work at a fixed price; (2) the independent nature of the worker's business or his distinct calling; (3) his employment of assistants with the rights to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) the worker's right to control the progress of the work except as to final results; (6) employment for a short, rather than long, period of time; (7) payment by job, rather than by time; and (8) performance of work that is not part of the regular business of the employer. *Id.* at 354. The factors need not all be present for a Court to find an independent contractor relationship, however, nor is any one particular factor controlling. *Id.*

■ To the extent a contract existed between the parties, there is little doubt that Plaintiff was an independent contractor. He set his own schedule at the job site and apparently also selected the aspects of the project in which he became involved. He performed the work for Defendants, none of which is in the business of residential construction, because of his particular expertise in construction management. Finally, although he demanded payment on a monthly basis, he alleges that the amount he demanded was calculated as a percentage of the total cost of the shop project—a fixed price for a certain piece of work.

## D. Accounting for Joint Venture

Plaintiff does not respond to Defendants' arguments in favor of summary judgment on his final claim for an accounting for a joint venture. The Court treats this claim as abandoned. *See, e.g., U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion. It GRANTS summary judgment in favor of all of the Defendants on Counts I and VIII. It GRANTS summary judgment in favor of Defendants SA, Patricia R. Hurley as Trustee of ECJ, and Patricia R. Hurley and Jeffrey P. Resnick as Trustees of NN on Counts II, III, IV, V and VI. The Court further GRANTS summary judgment in favor of Defendants SA and Patricia R. Hurley as Trustee of ECJ on Count VII. The Motion is DENIED in all other respects.