**Richard LARSON, Plaintiff,**

**v.**

**Edward C. JOHNSON,
et al., Defendants.**

**No. 01–CV–59–BS.**

United States District Court,
D. Maine.

April 15, 2002.

Frank T. McGuire, John W. McCarthy, Rudman & Winchell, Bangor, ME, for Richard W. Larson.

Bernard J. Kubetz, Marc J. Veilleux, Eaton, Peabody, Bradford & Veague, Bangor, ME, for Edward C. Johnson, Patricia R. Hurley, Jeffrey P. Resnick.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, District Judge.

Plaintiff Richard Larson sued Defendants Edward C. Johnson and three entities controlled by Johnson to force payment for services Larson rendered on a construction project. In an Order granting partial summary judgment (Docket #40), the Court granted judgment in favor of two of the entities in the suit. The case proceeded to trial, and a jury found for Johnson on all of Plaintiff's legal claims. Equitable claims for promissory estoppel and unjust enrichment against Johnson and Defendant Northern Neck Nominee Trust remain to be decided by the Court. Pursuant to Rule 52(a), the Court makes the following Findings of Fact and Conclusions of Law with regard to those claims.

## I. FINDINGS OF FACT

1. Richard Larson and Edward C. Johnson were longtime business associates and social friends.

2. The Northern Neck Nominee Trust is a nominee trust controlled by Johnson.

3. From 1995 to 1997, Larson acted as the project manager on a house construction project on Mount Desert Island, Maine, property owned by a trust controlled by Johnson (the "house project").

4. Larson and Johnson did not memorialize in writing any agreement about Larson's compensation.

5. Nevertheless, Johnson paid Larson $6,700 per month, plus lodging, for his efforts. Larson and Johnson also negotiated an additional $125,000 "bonus" at the conclusion of the project.

6. After the house project concluded, both agreed that in the future any agreement about Larson's compensation would be on paper.

7. During most of the house project, Larson lived in a house owned by Johnson on a property known as "Prays Meadow."

8. At Johnson's request, Larson remained at Prays Meadow after the house project ended and looked after Johnson's various real estate and charitable interests in Maine. He did so with the understanding that Johnson could ask him to leave Prays Meadow at any time.

9. In late summer 1999, Johnson asked Larson to help manage the construction of a workshop on land owned by Northern Neck Nominee Trust near the site of the original house project. This project became known as the "shop project."

10. Larson wanted to help with the shop project, but insisted upon being paid.

11. Johnson did not want to pay Larson for the shop project, and informed Larson in late September 1999 that Larson's services would not be needed after all.

12. In late November 1999, Larson and Johnson had another conversation in which Johnson asked Larson to help with the shop project. This conversation took place at the shop

project site, and only Larson and Johnson were present.

13. Larson expressed interest in helping with the shop project, but reiterated that he would like to be paid for any work he did.

14. Johnson told Larson to "trust" him, alluding to the fact that the two had, in the past, been able to reach an agreement on fair compensation for Larson's work. Johnson then asked Larson to contact his assistant, Patricia Hurley, and tell her that he would take on the job without monetary compensation.

15. Larson understood the conversation to mean that Johnson, at his discretion, would decide how much or how little to pay Larson for his shop project work. Larson believed it was implicit in the conversation that he could remain at Prays Meadow so long as he performed work for Johnson. He was aware, however, that there was a chance that Johnson would not pay him anything beyond living accommodations for his efforts on the shop project.

16. As instructed, Larson contacted Hurley and informed her that he was working on the shop project for free.

17. No agreement regarding Larson's compensation for the shop project was put in writing.

18. Larson began work on the shop project in earnest in early December 1999.

19. After he began that work, Larson told other people involved in the project that, as a favor to Johnson, he was working on it for free.

20. On two occasions during the course of the shop project, Larson contacted Hurley and Johnson to inquire whether he could receive "some-thing on account" for his services. Hurley and Johnson refused these requests.

21. In August 2000, when Larson asked for compensation on a third occasion, Johnson removed him from the shop project and asked him to vacate Prays Meadow.

22. Larson vacated the house, and in doing so incurred costs, including selling some furniture at a loss.

23. Larson worked on the shop project for a total of nine months, and added significant value to it.

## II. DISCUSSION

The only claims to be decided by the Court in this case are equitable claims for promissory estoppel and unjust enrichment. The Court addresses both of those claims mindful of its finding above that Plaintiff understood, after he and Defendant Johnson spoke in November 1999, that he risked not receiving any monetary compensation for his work on the shop project.

### A. Promissory Estoppel

■ "A promise which the [defendant] should reasonably expect to induce action or forbearance on the part of the [plaintiff] ... and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Daigle Commercial Group, Inc. v. St. Laurent*, 734 A.2d 667, 672 (Me.1999) (citing Restatement (Second) of Contracts § 90(1) (1981)). However, "words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise." Restatement (Second) Contracts § 77 (1979). Defendant Johnson's statement to Plaintiff that he would pay Plaintiff what he, Defendant Johnson, believed was fair, was just such an "illusory promise." Accordingly,

even if the Court accepts Plaintiff's argument that this statement was likely to induce action on Plaintiff's part, there is no promise for the Court to enforce. Moreover, the Court finds nothing inequitable or intuitively unfair about this result. Plaintiff, *at the time the statement was made,* understood its meaning.

Plaintiff argues in the alternative that Defendant Johnson's statement, at a minimum, can be interpreted as a promise to allow Plaintiff to remain at Prays Meadow while he worked on the shop project. He further maintains that this promise entitled him to stay at Prays Meadow for the duration of the shop project, whether he worked on it or not. The Court does not agree. To the extent Defendant Johnson told Plaintiff that he could stay at Prays Meadow while he participated on the project, Defendant Johnson followed through on that commitment. There is no evidence that Defendant Johnson ever agreed to allow Plaintiff to live at Prays Meadow while not working for Defendant.

B. Unjust Enrichment

A defendant is unjustly enriched when (1) a benefit is conferred upon him by the plaintiff; (2) the defendant knows of or appreciates the benefit conferred; and (3) the defendant accepts or retains the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *See, e.g., Aladdin Elec. Assocs. v. Town of Old Orchard Beach,* 645 A.2d 1142, 1144 (Me.1994). It is clear that Plaintiff conferred a benefit upon Defendants by working on the project, and that Defendants were aware of the benefit and appreciated it. It is not at all clear, however, that it would be inequitable for Defendants to retain that benefit without paying Plaintiff. Plaintiff acted with the knowledge that he might not be compensated for his services. Whether he did so out of a sense of obligation, friendship, or

simple hope for a payment like that which he received on the house project, Plaintiff was aware of the risk that he took, and it is not for the Court to assuage his disappointment in the outcome.

## III. CONCLUSIONS OF LAW

1. Defendant did not make a promise to Plaintiff that the Court is capable of enforcing pursuant to the doctrine of promissory estoppel.

2. Because Plaintiff rendered his services with the knowledge that he might not be compensated for them, it is not inequitable to deny Plaintiff the value of the benefit he conferred upon Defendants.

## IV. CONCLUSION

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court finds Defendants NOT LIABLE to Plaintiff for promissory estoppel or unjust enrichment.

SO ORDERED.