In re NATIONAL ENERGY & GAS TRANSMISSION, INC. (f/k/a PG & E National Energy Group, Inc.), et al., Debtors.

No. 03 30459.

United States Bankruptcy Court, D. Maryland.

Sept. 28, 2006.

---

Aryeh E. Stein, J. Daniel Vorsteg, Martin T. Fletcher, Baltimore, MD, Brant Warren Bishop, Kirkland and Ellis, LLP, Washington, DC, Cameron J. Macdonald, Carol L. Hoshall, Paul Nussbaum, Susan Jaffe Roberts, Whiteford, Taylor & Preston L.L.P., Baltimore, MD, Damon Wright, Washington, DC, Dennis J. Shaffer, Jesse Ernest Cox, Kevin G. Hroblak, Whiteford, Taylor, et al., Baltimore, MD, and Stephen Michael Humenik, Patton Boggs LLP, Washington, DC, for National Energy & Gas Transmission, Inc.

John L. Daugherty, Lynn A. Kohen, Greenbelt, MD, for U.S. Trustee.

Joel I. Sher, Richard Marc Goldberg, Shapiro, Sher, Guinot & Sandler, Baltimore, MD, for Official Noteholders' Committee and Creditor Committee.

Bradford F. Englander, Linowes and Blocher LLP, Bethesda, MD, Guy Sterling Neal, Sidley Neal, Sidley Austin LLP, Washington, DC, for Official Committee of Unsecured Creditors and Creditor Committee.

Aryeh E. Stein, Kirkland and Ellis, LLP, Washington, DC, Damon Wright, Washington, DC, Dennis J. Shaffer, Whiteford, Taylor, et al., Baltimore, MD, Guy Sterling Neal, Sidley Austin LLP, Washington, DC, for NEGT Energy Trading-Power, L.P., NEGT ET Investments Corporation, NEGT Energy Trading Holdings Corporation, and NEGT Energy Trading-Gas Corporation.

Dennis J. Shaffer, Whiteford, Taylor, et al., Baltimore, MD, for Energy Services Ventures, Inc. and Quantum Ventures.

David A. Becker, Latham & Watkins, LLC, Washington, D.C., for GS Power Holdings II, LLC.

*DECISION REGARDING MOTION FOR SUMMARY JUDGMENT AND CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT*

S. MARTIN TEEL, JR., Bankruptcy Judge.

Adam Mirick, Adam Hoffman, and Benoit Vallieres (the "Claimants") traded power for PG & E Energy Trading Hold-

ings Corporation, a debtor in this jointly administered case now known as NEGT Energy Trading Holdings Corporation ("ETHC"), until March of 2003. ETHC declined to award the Claimants bonuses for their work in 2002 at the instruction of its corporate parent PG & E National Energy Group, the co-debtor now known as National Energy & Gas Transmission, Inc. ("NEGT" and collectively with ETHC the "Objecting Debtors"). The Claimants filed suit in Maryland state court and, once the debtors' bankruptcy cases ensued, filed proofs of claim in this court referencing those lawsuits.[1] In addition to their claims for certain bonuses denied them in 2003 for work performed in 2002 (the "2002 Supplemental Bonus Claims"), the Claimants seek treble damages for portions of certain bonus awards for work performed in 2001 that were deferred until October of 2003, by which time all of the debtors had filed for bankruptcy (the "Deferred Compensation Claims"). All told, the Claimants seek to recover $15 million from the debtors' estates.

ETHC and NEGT jointly object to Hoffman's and Vallieres's proofs of claim, and ETHC has filed a separate objection to Mirick's proof of claim. Following discovery, the Objecting Debtors moved for summary judgment. The Claimants filed a summary judgment motion of their own with respect to their Deferred Compensation Claims, and Hoffman and Vallieres filed a separate motion for summary judgment on the issue of NEGT's joint employer liability.

Having reviewed the parties' papers and the record in this case, the court concludes for the reasons that follow that it must deny the Objecting Debtors' motion except with respect to the Claimants' request for treble damages on their 2002 Supplemental Bonus Claims and their claims based on theories of unjust enrichment, constructive trust and fraudulent conveyances. The court will also deny the partial motion for summary judgment filed by the Claimants and the partial motion for summary judgment filed by Hoffman and Vallieres.

I

As a subsidiary of NEGT and NEGT's parent corporation PG & E Corporation ("PG & E"), ETHC bought and sold electricity, natural gas, and other energy-related commodities as well as future interests in those commodities (Objecting Debtors' Statement of Undisputed Facts ¶ 5).[2] In August of 2000, NEGT introduced its Short Term Incentive Plan (the "STIP"), which provided bonuses for all employees at NEGT or any of its subsidiaries, including ETHC, who qualified (*id.* at ¶ 17). One aspect of the STIP was a "Supplemental Trading Component" for ETHC traders, which awarded special bonuses to traders (the "Supplemental Bonuses") in addition to the base STIP award, which has given rise to no dispute (*id.* at ¶ 17).

After awarding Supplemental Bonuses to the Claimants for work performed in 2000 (the "2000 Bonus Awards") and 2001 (the "2001 Bonus Awards"), NEGT declined to award any Supplemental Bonuses for work performed in 2002 due to the increasingly troubled finances of both debtors (*id.* at ¶¶ 35, 38, 68).[3] Instead, it awarded all qualifying employees 38% of

---

1. Hoffman and Vallieres filed proofs of claim against both Objecting Debtors. Mirick filed a proof of claim against ETHC, but was denied leave to file a proof of claim out of time against NEGT.

2. Unless otherwise noted, the facts cited herein are not disputed.

3. The parties disagree as to when NEGT decided not to award Supplemental Bonuses for work performed in 2002. *See* part II.C, *infra.* Both sides agree, however, that the decision

the base STIP award (*id.* at ¶ 67). On July 8, 2003, NEGT and ETHC both filed for relief under chapter 11 of the Bankruptcy Code (*id.* at ¶ 71).

### A. *Benoit Vallieres*

Benoit Vallieres was an energy trader at ETHC from October of 1997 to March of 2003 (Claimants' Statement of Undisputed Facts ¶ 3). He was named head power trader at ETHC sometime between 1999 and 2001 (Vallieres Tr. 43:15–17). The following chart summarizes his performance and supplemental compensation from 2000 to 2001:

| Year | Net Earnings Above Target (NEAT) | ETHC Financial Performance Assessment (12% of NEAT) | ETHC Adjustment on Subjective Assessment | ETHC Recommended Bonus | NEGT-Approved Bonus | Difference Between Recommended and Awarded Bonuses |
|---|---|---|---|---|---|---|
| 2000 | $12,337,470 | $1,480,496 | $396,776 | $1,877,272 | $1,752,272 | ($125,000) |
| 2001 | $26,718,656 | $3,206,239 | ($118,700) | $3,087,539 | $2,700,000 | ($387,530) |

(Objecting Debtors' Statement of Undisputed Facts ¶¶ 35, 38).[4]

Vallieres did not receive his 2001 Bonus Award in a lump sum. Instead, the award was distributed over four installments, with the bulk of the award coming in two installments scheduled for October of 2002 and October of 2003 assuming that Vallieres did not quit ETHC or lose his job "for cause" (Claimants' Ex. 3).[5] These installments were for $1,116,000.00 each (with interest) (*id.*). Vallieres was laid off on March 13, 2002 (Claimants' Statement of Undisputed Facts ¶ 3). ETHC concedes that it owes Vallieres $1,157,183.00 for the unpaid portion of his 2001 Bonus Award (*id.* at ¶ 13).

### B. *Adam Hoffman*

Adam Hoffman was an energy trader at ETHC from June of 2000 to March of 2003 (*id.* at ¶ 2). The following chart summarizes his performance and supplemental compensation from 2000 to 2001:

| Year | Net Earnings Above Target (NEAT) | ETHC Financial Performance Assessment (12% of NEAT) | ETHC Adjustment on Subjective Assessment | ETHC Recommended Bonus | NEGT-Approved Bonus | Difference Between Recommended and Awarded Bonuses |
|---|---|---|---|---|---|---|
| 2000 | $4,650,776 | $558,093 | ($89,791) | $468,302 | $468,302 | $0 |
| 2001 | $10,563,076 | $1,267,569 | ($77,056) | $1,190,513 | $1,000,000 | ($190,513) |

(Objecting Debtors' Statement of Undisputed Facts ¶¶ 35, 38).

Like Vallieres, Hoffman received his 2001 Bonus Award in installments, the last

was based on economics, not the performance of the Claimants.

4. The Claimants present slightly different numbers in their own motion for partial summary judgment (*see* Claimants' Undisputed Statement of Facts ¶ 3), but they do not dispute these numbers as set forth in the Debtors' motion for summary judgment, and the court will assume that the latter numbers are true for purposes of the Objecting Debtors' motion as they do not affect the outcome of the motion.

5. Inexplicably, neither the Claimants nor the Objecting Debtors attached affidavits authenticating the exhibits attached to their respective motions and memoranda in opposition to those motions as required by Rule 56(e). *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.1993). Although certain exhibits are authenticated through other means (*e.g.*, some of the deposition testimony), a sizeable portion of the proffered record would be excised if the court struck the unauthenticated exhibits *sua sponte*. In the absence of objection from any of the parties regarding these evidentiary defects, the court will treat all exhibits before it as having been the product of stipulation.

two of which were scheduled for October of 2002 and October of 2003 in the amount of $250,000.00 each (with interest) assuming that Hoffman did not quit ETHC or lose his job "for cause" (Claimants' Ex. 2). Hoffman was laid off on March 4, 2003 (Claimants' Statement of Undisputed Facts ¶ 2). ETHC concedes that it owes Hoffman $259,225.00 for the unpaid portion of his 2001 Bonus Award (*id.* at ¶ 13).

## C. *Adam Mirick*

Adam Mirick worked as an energy trader at ETHC from May of 1999 to March of 2003 (*id.* at ¶ 1). The following chart summarizes his performance and supplemental compensation from 2000 to 2001:

| Year | Net Earnings Above Target (NEAT) | ETHC Financial Performance Assessment (12% of NEAT) | ETHC Adjustment on Subjective Assessment | ETHC Recommended Bonus | NEGT- Approved Bonus | Difference Between Recommended and Awarded Bonuses |
|---|---|---|---|---|---|---|
| 2000 | $5,498,425 | $659,811 | $20,920 | $680,731 | $580,731 | ($100,000) |
| 2001 | $6,557,801 | $786,936 | ($6) | $786,930 | $715,000 | ($73,930) |

(Objecting Debtors' Statement of Undisputed Facts ¶¶ 35, 38).

Like the other Claimants, Mirick received his 2001 Bonus Award in installment payments. The final installment was scheduled to be paid (with interest) in October of 2003 assuming that Mirick did not quit ETHC or lose his job "for cause." (Claimants' Ex. 1).[6] Mirick was laid off on March 14, 2006 (Claimants' Statement of Undisputed Facts ¶ 1). ETHC concedes that it owes Mirick $111,467.00 for the unpaid portion of his 2001 Bonus Award (*id.* at ¶ 13).

## II

Pursuant to Fed.R.Civ.P. 56 (as incorporated by Fed. R. Bankr.P. 7056),[7] summary judgment will be granted where "there is no genuine issue as to the material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The court must deny summary judgment where there is a genuine issue as to any material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the movant makes a properly supported motion, the burden shifts to the opposing party to demonstrate specific facts showing that there is a genuine issue for trial. *Id.*

If the moving party does not bear the burden of proof at trial on an issue, summary judgment may be granted if the moving party shows "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant alleges that the opposing party lacks proof to establish requisite elements of its case, the movant must show the absence of such facts. *Id.* The court must view the opposing party's evidence in the light most favorable to non-movant's position and draw

**6.** The Claimants assert that Mirick was to be paid $110,000.00 in October of 2003 (Claimants' Statement of Undisputed Facts ¶ 1). The Objecting Debtors dispute this fact. They claim that Mirick was to be paid $215,000.00 in two installments in October of 2002 and October of 2003 (Objecting Debtors' Response ¶ 3). The exhibits cited by the Objecting Debtors do not support this assertion (*see* Objecting Debtors' Opp. Exs. A & B).

**7.** An objection to claim gives rise to a contested matter as defined by Fed. R. Bankr.P. 9014. *I.R.S. v. Taylor (In re Taylor),* 132 F.3d 256, 260 (5th Cir.1998). As such, Fed. R. Bankr.P. 7056 applies to the proceeding. Fed.R.Civ.P. 9014(c).

inferences in favor of that party, provided such inferences are justifiable or reasonable, and the court emphasizes that its analysis of the evidence that follows is made in that fashion, not as an indication of how it would actually view the evidence at trial when it would not be required to view the evidence in a light favorable to one side. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. 2002 Supplemental Bonus Claims

The Claimants allege numerous bases for recovery of their unpaid bonuses for work performed in 2002. All three Claimants assert violations of the Maryland Wage Payment and Collection Law, breach of contract, promissory estoppel, unjust enrichment,[8] constructive trust, and fraudulent conveyance.[9] Hoffman also pleads counts of negligent misrepresentation and novation.[10] The Objecting Debtors seek summary judgment with respect to each of these theories of relief.

#### 1. Maryland Wage Payment and Collection Law

Like many states, Maryland has codified a state analog to the federal Fair Labor Standards Act through a statute known as the Maryland Wage Payment and Collection Law. Md.Code of Labor and Employment § 3–501 *et seq.* (1999 ed.) (the "Mary-

land Wage Act" or the "Act"). Section 3–505 of the Act provides that "[e]ach employer shall pay an employee ... all wages due for work that the employee performed before the termination of employment ...." Section 3–501 of the Act defines the term "[w]age" as including "(i) a *bonus;* (ii) a commission; (iii) a fringe benefit; or (iv) any other remuneration promised for service." *Id.* at § 3–501(c)(2) (emphasis added).

Although the Act explicitly includes bonuses in its definition of the term "wage," not every incentive plan constitutes a "bonus" within the meaning of § 3–501(c)(2). Instead, "it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage." *Medex v. McCabe*, 372 Md. 28, 811 A.2d 297, 302 (2002). Only "compensation due to the employee as a result of employment ... that is promised in exchange for the employee's work" is subject to the Act, *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 783 A.2d 667, 671 (2001); anything else is "merely a gratuity, revocable at any time before delivery." *Medex*, 811 A.2d at 302. "Where the payments are dependent upon conditions other than the employee's efforts, they lie outside of the definition." *Id.*

At a minimum, the base STIP award was an integral part of the compensation

---

**8.** Hoffman and Vallieres included a separate count in the complaints attached to their proofs of claim for *quantum meruit,* but that count is wholly duplicative of their unjust enrichment count and will be stricken as a consequence. Similarly, the court will consider the two "counts" for breach of contract alleged by the Claimants in their state court complaints as one theory of damages for purposes of this motion.

**9.** Although the Claimants allege that NEGT is liable to them under the theory of construc-

tive trust and Hoffman and Vallieres allege fraudulent conveyances as well, the Claimants do nothing to support these allegations in their opposition to the Objecting Debtors' motion for summary judgment. The court will therefore grant summary judgment with respect to these theories of relief.

**10.** Hoffman's "novation" claim is really just a re-wording of his breach of contract claims, and will be treated as such by the court.

awarded to the Claimants in exchange for their work. Both Hoffman and Vallieres received offer letters from ETHC that explicitly included "participation in [ETHC's] . . . annual incentive award program" as part of their "total compensation" (Objecting Debtors' Exs. 5 & 8).[11] Beginning in August of 2000, the "annual incentive award program" consisted of the "STIP component" and the "[s]upplemental component" (Objecting Debtors' Ex. 10). The base STIP award was based on "NEG and individual objectives" (id.)—the same type of compensation scheme outlined in the Claimants' offer letters.

■ The Objecting Debtors do not dispute that the base formula provided by the STIP constituted a "bonus" for purposes of the Act. They argue, however, that the Supplemental Trading Component does not fall within the Act's purview because awards distributed under that part of the plan were discretionary and because they depended in the first instance on "consolidated . . . contribution[s]" from NEGT to PG & E Corp.'s earnings-per-share ("EPS") (Objecting Debtors' Mot. at 27).[12] While these arguments may prove successful at trial, the court concludes that there is a genuine issue of material fact as to their verity based on the record before it.

■ The Objecting Debtors cite Whiting–Turner for the proposition that "revocable" awards are not "bonuses" within the meaning of the Act. Although the court in Whiting–Turner did not actually reach this precise conclusion,[13] the court agrees with the Objecting Debtors that awards based solely on an employer's absolute discretion do not qualify (in the language of § 3–501) as "compensation . . . promised in exchange for the employee's work." A "promise[ ]" to pay an employee if the employer decides she wants to do so is illusory. Cheek v. Healthcare, 378 Md. 139, 835 A.2d 656, 661–62 (2003); see generally 1 Williston on Contracts § 4:6 (4th ed.).

■ The problem for the Objecting Debtors is that it is unclear what kind of discretion NEGT held under the Supplemental Trading Component. The Objecting Debtors cite numerous exhibits where the program was labeled "discretionary," but "this phrase is not necessarily the equivalent of 'for any reason whatsoever,

---

11. Unlike Hoffman and Vallieres, Mirick began his employment at ETHC as an analyst rather than a trader. Consequently, his offer letter from ETHC differs from the letters sent to the other Claimants (see Objecting Debtors' Ex. 9; Mirick Depo. Tr. 36:13–20). The court infers from other evidence in the record that all traders in the energy group were subject to the same basic compensation package, and that Mirick, like Hoffman and Vallieres, was paid in part for his work through ETHC's "annual incentive program."

12. See Meyers v. Josselyn, 212 Md. 266, 129 A.2d 158, 161 (1957) (employee had no right to bonus where contract vested employer with sole discretion as to funding of bonus pool from which bonuses were drawn). Meyers may ultimately prove controlling in this case, but for now the case remains distinguishable because the court in that case relied on the explicit language of the contract to determine that the employer's discretion was absolute whereas here there is evidence that the discretion of NEGT was limited from the outset.

13. In Whiting–Turner, the Maryland Court of Appeals held that a bonus payment that is not a part of the compensation package promised to an employee is not a "bonus" for purposes of the Maryland Wage Act. 783 A.2d at 673. The court concluded that "reading the statute as including a bonus as wages only when it has been promised as part of the compensation for employment is logical and makes good common sense." Id. at 672. The court noted, however, that "[o]nce a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages." Id.

no matter how arbitrary or unreasonable.'" *Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1154 (D.C.Cir.1984) (interpreting Virginia law); *accord Gregg v. U.S. Indus., Inc.,* 715 F.2d 1522, 1535 (11th Cir.1983) (applying New York law).[14] Unless it was the intent of the parties "to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties," there are "at least certain purposes for which the expressly conferred power to [exercise discretion] c[annot] be employed" due to the restrictions imposed by the covenant of good faith and fair dealing. *Id.* at 1153 (quotations omitted); *see also Univ. of Baltimore v. Iz,* 123 Md.App. 135, 716 A.2d 1107, 1127 (1998) (party to contract vested with discretion "must exercise that discretion in good faith") (internal quotation omitted) ("*Iz*").[15]

14. The Objecting Debtors cite New York case law for the proposition that the term "discretion" is a "magic word" conferring sole and absolute discretion upon the party so vested, but "New York has taken the lead in recognizing that an obligation of good faith is implied in every contract." *Gregg,* 715 F.2d at 1535. Consequently, "[w]here a bonus constitutes a term of employment and 'there exists a reasonable basis for calculating the bonus due an employee, a court may enforce the contract term.'" *Canet v. Gooch Ware Travelstead,* 917 F.Supp. 969, 985 (E.D.N.Y.1996) (quoting *Giuntoli v. Garvin Guybutler Corp.,* 726 F.Supp. 494, 508 (S.D.N.Y.1989)). Here, there is no contract in writing, and therefore no "magic words" to be found. Rather, the court must look at all of the evidence in the record to ascertain whether NEGT and the Claimants intended for NEGT to have unbridled discretion in its award of Supplemental Bonuses or whether that discretion was restrained by the covenant of good faith and fair dealing, which would have required NEGT to use a "reasonable basis" in awarding Supplemental Bonuses. *See Atl. Contracting & Material Co., Inc. v. Ulico Casualty Co.,* 380 Md. 285, 844 A.2d 460, 473 (2004) (holding that "good faith standard" in the context of indemnity suit allows "a discretion limited by the bounds of reasonableness, rather than by the bounds of fraud"); *Dorsey Bros. v. Anderson,* 264 Md. 446, 287 A.2d 270, 272–73 (1972) (evidence that party's exercise of discretion was "unreasonabl[e]" was relevant to jury determination of whether party acted in bad faith); *see also Carvel Corp. v. Diversified Mgmt. Group, Inc.,* 930 F.2d 228, 232 (2d Cir.1991) (franchisor breached covenant of good faith by using discretion accorded by franchise agreement to control business decisions of franchisee in an "unreasonable" manner); *Days Inn Worldwide, Inc. v. Sai Baba, Inc.,* 300 F.Supp.2d 583, 591 (N.D.Ohio 2004) ("Even in situations where a contract grants a party discretion to act, the implied covenant [of good faith] prevents a party from exercising that discretion unreasonably or outside the contemplated range of the agreement."); *Fremont v. E.I. DuPont DeNemours & Co.,* 988 F.Supp. 870, 878 (E.D.Pa.1997) ("the duty of good faith is implied in order to conform to the reasonable expectations of parties"); *Traumann v. Southland Corp.,* 858 F.Supp. 979, 983 (N.D.Cal.1994) (grant of discretion or right of approval for franchisor must be exercised in accordance with the "justified expectations" of the other party); *Perdue v. Crocker Nat'l Bank,* 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503, 510 (1985) (*en banc*) ("[T]he essence of the good faith covenant is objectively reasonable conduct.") (internal quotation omitted); *Midwest Mgmt. Corp. v. Stephens,* 291 N.W.2d 896, 913 (Iowa 1980) (right to terminate contract held in "sole discretion" of one party must be exercised "in a reasonable manner on the basis of fair dealing and good faith").

15. The covenant of good faith and fair dealing "is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes 'bad faith.'" *Tymshare,* 727 F.2d at 1152. "Among the types of bad faith recognized in judicial decisions are evasion of the spirit of the bargain and abuse of a power to specify terms." *White Stone Partners v. Piper Jaffray,* 978 F.Supp. 878, 881 (D.Minn. 1997). As the D.C. Circuit explained in *Tymshare:*

> [The doctrine] usually if not invariably perform[s] the same function executed (with more elegance and precision) by Judge Cardozo in *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917), when he found that an agreement which did not recite a particular duty was none-

334

" 'It is only where the option reserved to the promisor is unlimited that his promise becomes illusory and incapable of forming part of a legal obligation.' " *Stamatiades v. Merit Music Service, Inc.*, 210 Md. 597, 124 A.2d 829, 838 (1956) (quoting 1 Williston *Contracts* § 43 (rev. ed.)).[16]

■ Either way, "the intent of the parties ... in making the contract must control ...." *Tymshare*, 727 F.2d at 1153 (quotation omitted); *accord Pinar v. Dole*, 747 F.2d 899, 915 (4th Cir.1984).[17] Courts usually look to the language of the contract itself in deciding whether the investiture of discretion in one party is intended to be absolute. *See Riggs Nat'l Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373–74 (4th Cir.1994) (applying Virginia law). But in this case there is no written contract, forcing the court to look at the

parties' conduct for guidance. *Lee v. Joseph E. Seagram & Sons, Inc.*, 413 F.Supp. 693, 698 (S.D.N.Y.1976).

The Claimants have produced evidence to the effect that the "discretion" mentioned in various exhibits describing the Supplemental Trading Component actually refers to a small subset of the total award, which was based on a mechanical formula measuring individual traders' NEAT (Claimants' Ex. 1 ¶¶ 7–8, Ex. 2 ¶¶ 12–13, Ex. 3 ¶ 5).[18] Although some evidence in the record suggests that this formula was actually used to determine the recommendations made by ETHC senior management to NEGT rather than the awards themselves (*see* Andre Depo. Tr. 42:9–13; Barron Depo. Tr. 53:2–4; Maddox Depo. Tr. 237:21, 297:13–20),[19] the Claimants' evi-

---

theless " 'instinct with [...] an obligation,' imperfectly expressed." *Id.* at 1152 (quoting *Wood*, 118 N.E. at 214 (quoting *McCall Co. v. Wright*, 133 A.D. 62, 117 N.Y.S. 775, 779 (N.Y.App.Div.1909), *aff'd* 198 N.Y. 143, 91 N.E. 516 (1910))).

**16.** The court recognizes that under Maryland law "there is no implied covenant of fair dealing with regard to termination by either side in an employment-at-will," *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 596 A.2d 1069, 1076–77 (1991), but the dispute between the parties here does not concern the Claimants' termination, but rather the determination of their Supplemental Bonuses under the Supplemental Trading Component of the STIP.

**17.** *See also Taylor Equip. Inc. v. John Deere Co.*, 98 F.3d 1028, 1032 (8th Cir.1996) ("the purpose of the implied covenant [of good faith and fair dealing] is to honor the parties' *justified* expectations") (emphasis in original).

**18.** There is some documentary evidence to support the Claimants' position. For example, a draft summary of the STIP prepared by outside consultants describes the Supplemental Trading Component for ETHC employees as having "been based on 15% of trader net 'book' profits—after deductions for expenses, risk[,] costs, *etc.*" and recommended "an 8 to

15% range for individual payments from the pool, based on discretionary performance criteria ..." (Claimants' Ex. 18). Excerpts from the "2000 STIP Binder" and "2001 STIP Modeling" also set forth a detailed formula for calculating Supplemental Bonuses (Objecting Debtors' Exs. 17, 19). Other former employees at ETHC have testified to the same effect (*see* Tanselle Depo. Tr. 145:1–22, 146:1–8, 149:16–22, 150:1–8; Stenberg Depo. Tr. 8:13–22; Schweider Depo. Tr. 88:10–16; Knust Depo. Tr. 19:18–23, 20:1–2; Bordeleau Depo. Tr. 9–11, 39–40).

**19.** In addition, a slide show entitled "2000 Commercial STIP Review" explained that "[r]ecommendations" for Supplemental Bonuses would consist of "15% of net operating margin above 2X target," with a "portion allocated to book" and the "remainder allocated to management pool" (Objecting Debtors' Ex. 16). The document stated that awards could be "adjusted to account for qualitative factors including: teamwork, NEGT performance, strategic acumen, leadership, commitment, development, *etc.*," but that "[a]ll supplemental awards [were] subject to [then-NEGT president] Tom Boren's approval" (*id.*). A "Q & A" sheet explaining the STIP further clarified that "a formulaic calculation may be one of the factors used in determining initial recommendations," but that,

dence to the contrary forecloses resolution of the issue under Rule 56.

■ Even if the court were to discount the Claimants' affidavits, it is far from clear that the parties intended for NEGT to have the ability to deny Supplemental Bonuses on a whim. Although the slide show presentation introducing the STIP refers to the "discretion" of NEGT in awarding Supplemental Bonuses, it does not state that NEGT could deny such bonuses for any reason under the sun. This ambiguity cuts against the reading of the agreement proferred by the Objecting Debtors because "[w]here what is at issue is the retroactive reduction or elimination of a central compensatory element of the contract—a large part of the *quid pro quo* that induced one party's assent—it is sim-

ply not likely that the parties had in mind a power quite as absolute as [the Objecting Debtors] suggest[ ]." *Tymshare*, 727 F.2d at 1154.[20]

There is some support in the record for inferring limitations in the exercise of NEGT's discretion. A "Q & A" document prepared by NEGT's human resources department states that the Supplemental Trading Component (which, as previously noted, served as the basis for Supplemental Bonuses) was "a discretionary component" to the STIP, but went on to say that "the supplemental component *will* exist for those eligible individuals who deliver stellar performance at a target level set upwards of the 2X performance level targets of regular STIP" (Objecting Debtors' Ex. 13) (emphasis added).[21] Another exhibit

---

"[a]t the end of the day, ... all recommendations, formulaic or otherwise, will go through the approval process outlined, which may result in an authorized award that varies from the original recommendation" (Objecting Debtors' Ex. 13).

20. The Objecting Debtors' reliance on *McNamara v. EnCana Energy Services, Inc.*, 2005 WL 2106088 (S.D.Tex. Aug.30, 2005), is unavailing. In that opinion, the District Court for the Southern District of Texas granted the defendant's motion for summary judgment with respect to claims raised by two of the defendant's former employees based on the alleged inadequacy of the bonuses awarded to the employees. *See id.* at *1–5. The court specifically noted that it "ha[d] already ruled that the [incentive plan at issue in the case] was not a contract ...." *Id.* at *1. Indeed, the court had determined in a prior order that the incentive plan offered by the defendant was not a binding contractual arrangement—because the "plan" did nothing more than reward employees for work performed before the plan was ever conceived. *McNamara v. EnCana Energy Services, Inc.*, Civ. Act. H–03–226, slip op. at 3 (S.D.Tex. May 14, 2006). The court agrees "that no enforceable contractual obligation is created when an employer offers employees a bonus for doing that which an employee is already required to do pursuant to the terms of the engagement of employment," *Windesheim v. Verizon Network*

*Integration Corp.*, 212 F.Supp.2d 456, 462 (D.Md.2002), but the Supplemental Trading Component was prospective, unlike the incentive structure offered by the defendant in *McNamara*, and therefore involved an exchange of work ("superperformance") for remuneration (Supplemental Bonuses) separate from the base compensation and base STIP bonuses.

21. The Objecting Debtors argue that the "Q & A" response quoted above does not support an inference that NEGT committed to paying Supplemental Bonuses to eligible traders when read in the context of the full answer. Specifically, the answer goes on to say: "It is not in the company's best interest to deny supplemental incentive pay to a key trader ... simply because of a loss occurring in *another* segment [of] our business *outside the NEG[T]* " (Objecting Debtors' Ex. 13) (emphasis added). The court finds this argument unpersuasive. While the answer uses the loss of a separate unit rather than an intra-company loss as an example, the point of the illustration is to convey to traders that they will receive bonuses based on their individual performances because "such key contributions offer the corporation the financial means to somewhat mitigate such losses" (*id.*). Reading this answer in the light ·most favorable to the Claimants, the response states a general principle (that Supplemental Bonuses would

submitted by the Objecting Debtors (labeled "2000 Commercial STIP Review") suggests that NEGT restricted its own discretion such that Supplemental Bonuses were awarded "based on financial performance above 2X target, teamwork, strategic acumen, leadership, commitment, development, *etc.*" (Objecting Debtors' Ex. 16).[22] A factfinder could easily infer from these documents that NEGT's discretion was restricted to evaluating the bonus recommendation from ETHC management according to its own determinations of how well ETHC's individual traders performed.[23]

The Objecting Debtors' second argument—that awards distributed pursuant to the Supplemental Trading Component were not "bonuses" for purposes of the Act because the awards were dependent on contributions from NEGT to PG & E Corp.'s EPS—stands on even shakier ground. While the slide show presentation introducing the STIP explained that the mechanism for funding the Supplemental Trading Component would be "consolidated NEG[T] contribution to PG & E Corporation EPS" (Objecting Debtors' Ex. 10), it did not state that this funding was a prerequisite to the payment of Supplemental Bonuses. To the contrary, the "Q & A" sheet provided by NEGT's human resources division stated that while there was "no formal mechanism for the pool," all employees should be "reassured" that the pool would exist for "eligible individuals" (Objecting Debtors' Ex. 13). One outside consultant to NEGT described the Supplemental Trading Component as being "based on a loosely defined measure of ET[HC] profitability" rather than NEGT's contributions to its parent company's EPS (Claimants' Ex. 19), and ETHC corporate designee Robert Barron testified at his deposition that the Supplemental Bonuses came "from the general pool of corporate profits" (Claimants' Ex. 20). These exhibits create at least a genuine issue of material fact as to whether NEGT earnings were a prerequisite to the payment of Supplemental Bonuses.

There is one portion of the claims raised by the Claimants under the Act that is susceptible to summary judgment. The Act permits recovery of treble damages by an injured employee for withheld wages if the "employer withheld the wage ... not as a result of a bona fide dispute ...." Md.Code of Labor and Employment Law § 3–507.1. In determining whether a "bona fide" dispute exists, "[t]he question, simply, is whether there [is] sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to

---

be paid regardless of NEGT's financial performance because "superperforming" traders necessarily improved that performance) and then illustrates that principle through reference to the specific example of "loss[es] occurring ... outside the NEG[T]."

NEGT's answer stands in sharp contrast to its answer to a different hypothetical question regarding additional compensation for actions beneficial to the company but not covered by the STIP. NEGT stated only that it "always ha[s] the discretion to evaluate whether additional discretionary spot payment[s] may be appropriate" and that such payments "would certainly be a rare exception, but is always possible" (Objecting Debt-

ors' Ex. 13). This type of equivocal answer is clearly not an enforceable promise.

**22.** Several traders at ETHC have testified in support of this theory (*see* Stenberg Depo. Tr. 13:2–5, 21–25; Vincent Depo. Tr. 37:16–20, 38:1–5, 58:10–13, 78:8–22).

**23.** According to ETHC vice-president Sarah Barpoulis, this practice was actually followed in approving the initial round of Supplemental Bonuses (Barpoulis Depo. Tr. 47:6–19). Over time, NEGT took less and less of an interest in the individual bonuses awarded, preferring to look at the aggregate amount of awards instead (*id.* at 48:2–8, 14–22).

pay" the withheld wages. *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 745 A.2d 1026, 1031 (2000). Plainly, the Objecting Debtors have a legitimate argument that the Supplemental Trading Component was entirely discretionary and therefore not an enforceable promise to provide a "bonus" within the meaning of the Act. While that argument may not be so incontrovertible as to warrant summary judgment based on the limited record before the court, the evidence adduced by the Objecting Debtors in support of their position forecloses any possibility of "bad faith" in the furtherance of the argument itself (*see* Objecting Debtors' Exs. 10, 13, & 16; Claimants' Ex. 10; Runge Aff. ¶ 12; Barpoulis Depo. Tr. 350:1; Maddox Depo. Tr. 237:14, 297:23–25). The court will grant the Objecting Debtors summary judgment with respect to the treble damages component of the Act.[24]

### 2. *Breach of contract*

 The court has already concluded that there is evidence in the record suggesting that ETHC's bonus program was a significant component of the employment offer accepted by the Claimants. By accepting ETHC's offers and working pursuant to the terms of those offers, the Claimants entered into an implied contract with ETHC. *See County Commissioners of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 747 A.2d 600, 606 (2000) (defining an implied contract as "an agreement which legitimately can be inferred from [the] intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men") (internal quotations omitted) ("*Caroline County*"). The

court has also concluded that it can infer from the record that the STIP replaced the bonus plan in existence when the Claimants commenced employment, effectively modifying the employment agreements between ETHC and the Claimants. *See Cole v. Wilbanks*, 226 Md. 34, 171 A.2d 711, 712 (1961) ("Assent to an offer to vary, modify or change a contract may be implied and found from circumstances and the conduct of the parties showing acquiescence or agreement."). Once again, the issue is whether the Supplemental Trading Component of the STIP was a part of that modified contract.

The same evidence that created a genuine dispute of material fact with respect to the status of the Supplemental Trading Component of the STIP under the Act compels the court to conclude that there is a genuine dispute of material fact as to whether the Supplemental Trading Component was an enforceable provision of the Claimants' employment agreements. There is evidence in the record that NEGT's discretion under the Supplemental Trading Component was not absolute (*see, e.g.,* Objecting Debtors' Ex. 13 (discussed in n. 19, *supra*)). This evidence suggests that NEGT reserved the right to modify the bonuses recommended by ETHC senior management based on its own assessment of the merits of those recommendations (*see* Objecting Debtors' Ex. 16; Barpoulis Depo. Tr. 47:6–19). Assuming for the sake of argument that this was the case, NEGT's discretion was cabined by the covenant of good faith and fair dealing, and its promise to provide Supplemental Bonuses was not illusory. *Iz,* 716 A.2d at 1127; *see also Perdue,* 216 Cal.

---

**24.** The court declines to address the alternative argument raised by the Objecting Debtors that the Bankruptcy Code forbids the award of treble damages under the Act because there is no genuine issue of material fact with re-

spect to the bona fides of the Objecting Debtors' good faith arguments regarding the Claimants' underlying claims for withheld wages.

Rptr. 345, 702 P.2d at 510 (agreement is not illusory if one party is vested with discretion because such discretion is restricted by the covenant of good faith and fair dealing).

The Objecting Debtors argue that the terms of the Supplemental Trading Component of the STIP are too vague to be enforceable. *See Kiley v. First Nat'l Bank of Md.*, 102 Md.App. 317, 649 A.2d 1145, 1152 (1994) ("Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract.") (quotation omitted); *but see Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183, 187 (1941) ("The law does not favor, but leans against, the annulment of contracts on the ground of uncertainty."); *Gregg*, 715 F.2d at 1536 ("finding a contract unenforceable for indefiniteness is 'at best a last resort'") (quoting *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 232 N.Y. 112, 133 N.E. 370, 371 (1921)). The Objecting Debtors' approach would effectively render *any* contractual provision vesting discretion in

one party unenforceable. This result is at odds with established case law. *See 8621 Ltd. P'ship v. LDG, Inc.*, 169 Md.App. 214, 900 A.2d 259, 267 (2006) ("Lack of specific terms ... does not necessarily make a particular clause in a contract meaningless."); Restatement (Second) of Contracts § 34(1) (1981) ("The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance.").[25]

■ Such a rule would also be wrong as a matter of principle. The evidence in the record permits three possible inferences by the court: either (1) NEGT had sole and absolute discretion to deny Supplemental Bonuses for any reason whatsoever, no matter how arbitrary or capricious; (2) NEGT could allocate a portion of the traders' total NEAT to individual traders in its discretion;[26] or (3) NEGT could modify the bonus awards recommended by ETHC management so long as its discretion was exercised in good faith.[27]

---

**25.** *See also Larson v. Johnson*, 184 F.Supp.2d 26, 32 (D.Me.2002) ("The Court could enforce an agreement in which the form, or nature, of payment is left to one party's discretion, provided the amount, or extent, of payment is fixed."); *Lee*, 413 F.Supp. at 698 ("[C]ourts ... will not shy away from enforcing a contract because there appears to be ... a broad discretion vested in one of the parties. In these situations the law implies a duty of good faith and fair dealing."); *Martell v. Atlanta Biltmore Hotel Corp.*, 114 Ga.App. 646, 152 S.E.2d 579, 581 (1966) ("Contracts in which the promise of one party to render a performance is conditional on his own judgment and sensibilities have been almost universally upheld.").

**26.** The Objecting Debtors point to discrepancies in the way the individual Claimants calculate their Supplemental Bonuses as evidence that no agreement was actually reached between the parties. The court agrees that these internal inconsistencies fore-

close summary judgment in the Claimants' favor, but the Claimants have not moved for summary judgment with respect to their 2002 Supplemental Bonus Claims. That two of the Claimants may have misstated the terms of the Supplemental Trading Component does not demonstrate that the remaining Claimant has failed to set forth accurately the terms of the implied-in-fact agreement as contemplated by the parties at the time of the agreement. Even if all of the Claimants err in their description of the scope of NEGT's discretion, the court could still conclude from the conduct of the parties that there was an understanding between the parties as to the nature of that discretion.

**27.** There is a subsidiary issue as to whether actions taken by ETHC's traders in November and December of 2002 should be included in calculating their Supplemental Bonuses. The court reserves this issue for trial because there is a genuine dispute of material fact with respect to whether ETHC management

There may be a dispute as to which inference accurately reflects the intent of the parties, but that does not mean that the intent of the parties is unfathomable. A defendant in a breach of contract suit cannot annul the contract on grounds of vagueness simply by disputing its terms.

Finally, the Objecting Debtors argue that they received no consideration for the Supplemental Bonuses. "Longstanding Maryland legal principles recognize that no enforceable contractual obligation is created when an employer offers employees a bonus for doing that which an employee is already required to do pursuant to the terms of the engagement of employment." *Windesheim,* 212 F.Supp.2d at 462. In this case, however, there is evidence that the STIP, as the successor to the compensation plan used by ETHC when it hired the Claimants, was an integral part of the Claimants' compensation for the work that they performed. Nor was the Supplemental Trading Component redundant of the base STIP; to the contrary, Supplemental Bonuses were designed to encourage traders to exceed the goals set for them by the base STIP package. Traders were awarded bonuses for "superperforming," not for showing up to work.

The court can infer from the record before it that the STIP was a modified version of the Claimants' employment agreements, that the Supplemental Trading Component was a binding part of those modified agreements, and that the program awarded traders in exchange for performance above and beyond that required by the employment agreements. The court will deny summary judgment with respect to the Claimants' contract claims.

### 3. *Promissory estoppel*

The Claimants allege in the alternative that they relied to their detriment on promises made by ETHC senior management that Supplemental Bonuses would be awarded to eligible traders for work performed in 2002 and should be recompensed for their reliance even if NEGT had absolute discretion to deny the bonuses. "The historical development of promissory estoppel, or detrimental reliance, in Maryland has mirrored the development nationwide." *Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc.,* 342 Md. 143, 674 A.2d 521, 531 (1996). In *Pavel Enterprises,* the Maryland Court of Appeals explicitly adopted the test set forth in the Restatement (Second) of Contracts to determine whether a claim for promissory estoppel is valid. *Id.* at 532. The test requires the following elements:

1. a clear and definite promise;
2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
3. which does induce actual and reasonable action or forbearance by the promisee; and
4. causes a detriment which can only be avoided by the enforcement of the promise.

*Id.* (citing Restatement (Second) of Contracts § 90(1) (1979)).[28]

The Objecting Debtors argue that there was no reasonable expectation of forbear-

---

promised to exclude those months from the Supplemental Trading Component (*see, e.g.,* Bordeleau Depo. Tr. 92–93).

**28.** The doctrine of promissory estoppel essentially imposes contractual burdens on a promisor even if the promisor receives no consideration for her promise because of the potential harm suffered by the promisee through her reliance on that promise. To the extent that the court finds as a factual matter that ETHC received consideration in exchange for Supplemental Bonuses, the Claimants' promissory estoppel claims would be moot because the Claimants would either succeed in their breach of contract claims or fail under both

ance here because the Supplemental Bonuses were not reduced to writing. *See Union Trust Co. of Md. v. Charter Med. Corp.*, 663 F.Supp. 175, 179 (D.Md.1986) ("incurring ... large debts in reliance solely upon an oral promise of this nature clearly exceeds the bounds of commercial reasonableness" (citation omitted)).[29] There are many contexts in which the court's observation in *Union Trust* would be apropos, but this is not one of them. The Claimants have produced evidence showing that they entered into written employment agreements with ETHC that included bonus payments as part of their compensation (Objecting Debtors' Exs. 5, 8), that the bonus plan in place when they began work at ETHC was replaced by the STIP through a formal "roll-out" in the fall of 2000 (Objecting Debtors' Ex. 10), that the Supplemental Trading Component of the STIP was honored with respect to work performed in 2000 and 2001 (Objecting Debtors' Statement of Undisputed Facts ¶¶ 35, 38), and that ETHC traders were repeatedly assured that Supplemental Bonuses would be awarded again for work performed in 2002 (Vallieres Decl. ¶¶ 29–30, 32–33, Mirick Decl. ¶¶ 15, 20–22; Hoffman Decl. ¶ 19–20; Claimants' Exs. 29–31). Assuming that these facts are true, the Claimants had every right to rely upon the promises made by ETHC senior management.

The Objecting Debtors also argue that the Claimants did not actually rely on the Supplemental Trading Component of the STIP to continue working for ETHC because the Supplemental Trading Component was not a part of ETHC's original bonus scheme. But the Claimants do not assert that they joined ETHC based on the prospect of receiving Supplemental Bonuses; rather, they claim that they stayed at ETHC through a massive financial downturn based in large part on the promise of additional compensation for their individual achievements. There is evidence in the record to support this position (*see* Mirick Decl. ¶¶ 16, 23–24; Vallieres Decl. ¶ 36; Hoffman Decl. ¶¶ 18, 23).

Finally, the Objecting Debtors assert that the Claimants could not have actually relied on any promises made by ETHC to their detriment because there is no evidence in the record that the Claimants turned down or even received job offers from other companies. This argument is so fatuous that it hardly requires comment at all. The record is replete with references to the prodigious skills of the Claimants and the high esteem in which their work was held (*e.g.*, Objecting Debtors' Exs. 18, 20; Barron Depo. Tr. 203:10–20, 204:1–18). The Claimants themselves assert under penalty of perjury that they could have and would have left ETHC for an equivalent position at a more stable company had it not been for the promises made to them by ETHC senior management (Mirick Decl. ¶¶ 16, 23–24; Mirick Depo. Tr. 96:18–97:04; Vallieres Decl. ¶ 36; Vallieres Depo. Tr. 165:2–22, 166:5–8, Hoffman Decl. ¶¶ 18, 23; Hoffman Depo. Tr. 218:1–4, 219:11–13). The court does

---

theories. At this stage in the case, however, the court is not in a position to make such findings. The court must therefore consider the Objecting Debtors' motion for summary judgment with respect to the Claimants' promissory estoppel claims on its merits rather than dismiss the promissory estoppel counts as moot.

**29.** The Objecting Debtors contend that the discretionary nature of the Supplemental Trading Component made it impossible for the Claimants to rely upon it. The court rejects this argument for the same reason that it rejected the Objecting Debtors' "vagueness" argument in the context of the Claimants' breach of contract counts: *i.e.*, the discretion of NEGT may not have been absolute. *See* part II.A.2, *supra*.

not need phone logs or offer sheets to infer that the Claimants could have procured employment elsewhere had they so desired. The court will deny summary judgment with respect to the Claimants' promissory estoppel causes of action.

### 4. Unjust enrichment

■■■■ "Unjust enrichment and *quantum meruit,* both 'quasi-contract' causes of action, are remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided." *Dunnaville v. McCormick & Co.,* 21 F.Supp.2d 527, 535 (D.Md.1998). "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." *Caroline County,* 747 A.2d at 607. As the Maryland Court of Appeals explained in *Caroline County:*

> When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow.

*Id.*

The court has already concluded that the parties entered into binding employment agreements that were modified by the STIP (*see* part II.A.2, *supra*). The only question is whether the Supplemental Trading Component is an enforceable part of the modified contract entered into by the parties. Either way, there is no question that the work performed by the Claimants was covered by their employment agreements.[30] Summary judgment is appropriate with respect to their quasi-contract claims.

### 5. Negligent misrepresentation

■■ Separate and apart from his alleged detrimental reliance on ETHC's promises to provide Supplemental Bonuses in exchange for his continued work, Hoffman asserts that ETHC senior management made several misleading statements that rise to the level of negligent misrepresentation. Specifically, Hoffman argues that ETHC management represented in 2002 that its traders were earning and had earned 2002 Supplemental Bonuses and stated in February of 2003 that ETHC was "running [the] numbers" (Claimants' Ex. 34)[31] for the 2002 Supplemental Bonuses when in fact ETHC had already decided not to award such bonuses. Hoffman seeks "the benefit of [his] bargain" with ETHC (*i.e.,* his unpaid 2002 Supplemental Bonus) under the so-called "flexibility theory" of damages. *Ward Dev. Co. v. Ingrao,* 63 Md.App. 645, 493 A.2d 421, 428–29 (1985).

---

**30.** This is not to suggest that ETHC did not receive consideration in exchange for its promise of Supplemental Bonuses. The bonuses were promised in exchange for exemplary performance, not for additional work.

**31.** Claimants' Exhibit 34 consists of typewritten notes taken by Sarah Barpoulis of comments made by ETHC president Lyn Maddox at the February meeting. Although Maddox's statements are obviously admissible as party admissions, the notes reflecting the impressions of the trader attending the hearing are hearsay in and of themselves, and the court would not have considered this exhibit had the Objecting Debtors objected to the notes' admission. But the Objecting Debtors did not object to any of the exhibits proffered by the Claimants, so the court will assume for purposes of this motion that all of the Claimants' exhibits are admissible evidence.

342

In *Law v. Int'l Union of Operating Engineers Local No. 37, AFL–CIO,* 373 Md. 459, 818 A.2d 1136 (2003), the Maryland Court of Appeals set forth the elements of the tort of negligent misrepresentation as follows:

"(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence."

*Id.* at 1145 (quoting *Martens Chevrolet v. Seney,* 292 Md. 328, 439 A.2d 534, 539 (1982)). "For claims of economic loss due to negligent misrepresentation, the injured party must prove that the defendant owed him or her a duty of care by demonstrating an intimate nexus between them," which "may be demonstrated by showing contractual privity or its equivalent." *Griesi v. Atlantic Gen. Hosp. Corp.,* 360 Md. 1, 756 A.2d 548, 554 (2000).

As ETHC's contractually bound employee, Hoffman was entitled to rely upon the representations made by ETHC senior management. *See Abercrombie v. Nationwide Mut. Ins. Co.,* 999 F.Supp. 660, 663 (D.Md.1998) ("contractual privity, such as that created by a contract of employment, creates a sufficiently 'intimate nexus' to sustain the tort of negligent misrepresentation"). The context of the representations suggest that ETHC made the statements to assuage its traders' fears and keep them in place as long as possible (*see* Claimants' Exs. 10, 34). Moreover,

"an employer reasonably should foresee that negligent misrepresentation of employment information may result in economic harm to the prospective employee," *Griesi,* 756 A.2d at 556, and, as noted above, the Claimants have testified under oath that they relied to their detriment on the statements made by ETHC senior management. The only remaining question is whether the representations were false or merely " 'expressions as to what w[ould] happen in the future,' " which " 'are not actionable as fraud.' " *Miller v. Fairchild Indus., Inc.,* 97 Md.App. 324, 629 A.2d 1293, 1302 (1993) (quoting *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 469 A.2d 867, 888 (1984)).

Hoffman asserts that NEGT decided on January 7, 2003, not to award Supplemental Bonuses for work performed in 2002—some time before ETHC senior management represented to its traders that they would be paid those bonuses (Claimants' Statement of Disputed Facts ¶ 60). In support of this assertion, he directs the court to a proposed key employee retention plan ("KERP") submitted by an outside consultant on January 7, 2003, that recommends canceling any Supplemental Bonuses for work performed in 2002 (Claimants' Ex. 17), and an e-mail dated January 13, 2003, with a spreadsheet attached listing ETHC's Supplemental Bonus pay-outs for work performed in 2002 as nothing (Claimants' Ex. 41).

Reading these documents in the light most favorable to Hoffman, the court cannot infer that the decision not to award Supplemental Bonuses was made by January 7, 2003, because the only document referencing that date is a proposed plan, but can infer from the more ambiguous spreadsheet circulated a week later that the 2002 Supplemental Bonuses were canceled by that date. While there is scant evidence in the record that Hoffman was

harmed by remaining at ETHC between January 13, 2003, and March 3, 2003, specifically, the court has already concluded that the evidence in the record permits a general inference that Hoffman could have pursued other employment opportunities during his tenure at ETHC. The record is equally clear that Hoffman needed to stay at ETHC if he wanted to collect his anticipated Supplemental Bonus for work performed in 2002.

■ Considering all of these possible inferences in tandem, the court concludes that there is a genuine (though tenuous) dispute of material fact with respect to Hoffman's negligent misrepresentation claim. The Objecting Debtors' summary judgment motion will be denied insofar as it concerns Hoffman's negligent misrepresentation argument.[32]

B. *Deferred Compensation Claims*

The Claimants cross-move for summary judgment with respect to their Deferred Compensation Claims. ETHC does not object to the *pro rata* payment of the unpaid portion of the Claimants' unpaid 2001 Supplemental Bonuses,[33] but argues that it should not be subject to treble damages under § 3–507.1 of the Maryland Wage Act. The court has already concluded that there is a genuine dispute of mate-

rial fact with respect to whether the anticipated Supplemental Bonuses for work performed in 2002 were "wages" for purposes of the Act, *see* part II.A.1, *supra,* and has specifically noted evidence in the record supporting the Objecting Debtors' argument that Supplemental Bonuses were entirely discretionary and therefore not enforceable promises made in exchange for work performed by the Claimants (*see* Objecting Debtors' Exs. 10, 13, 16; Claimants' Ex. 10; Runge Aff. ¶ 12; Barpoulis Depo. Tr. 350:1; Maddox Depo. Tr. 237:14, 297:23–25).

The parties' contradictory evidence not only forecloses application of § 3–507.1 of the Maryland Wage Act at this stage in the case, but also suggests that the Claimants' pursuit of treble damages is doomed as a matter of law. Section 3–507.1 permits the court to award treble damages only if there is no "bona fide dispute" as to whether ETHC violated §§ 3–502 or 3–505. The court has already held that such a dispute exists with respect to the 2002 Supplemental Bonus Claims (thus mandating partial summary judgment) and sees no basis for distinguishing those claims from the Deferred Compensation Claims.[34] Nonetheless, the court will refrain from granting summary judgment in favor of ETHC *sua sponte* until the Claimants have had an opportunity to brief this spe-

---

**32.** Almost two months after the close of briefing on the Objecting Debtors' motion, the Claimants filed a motion to compel the production of certain legal opinion letters held by the Objecting Debtors in which counsel for NEGT discusses the possible legal ramifications of denying the Claimants' their Supplemental Bonuses for work performed in 2002. Like the KERP submitted on January 7, 2003, these memoranda permit the court to infer only that termination of the Supplemental Trading Component was under consideration prior to February of 2003, not that the decision to terminate the plan had been made. The court will therefore deny the motion to compel as moot.

**33.** NEGT objects to the claim in its entirety on the grounds that its predecessor NEGT was not the Claimants' employer. The court addresses this issue in part C, *infra.*

**34.** Lest the reader forget, the Deferred Compensation Claims also seek compensation for Supplemental Bonuses (in this case, for work performed in 2001). The court's analysis regarding the proper application of the Maryland Wage Act to the 2002 Supplemental Bonus Claims therefore applies with equal effect to the Deferred Compensation Claims.

cific issue, as it was raised for the first time at the hearing on the Claimants' motion. *Allstate Insur. Co. v. Fritz*, 452 F.3d 316, 323 (4th Cir.2006) (requiring notice and an opportunity to demonstrate genuine issue of material fact prior to entry of summary judgment *sua sponte* ).[35]

### C. Joint Employer Liability

#### 1. Applicable standard

 Hoffman and Vallieres move for partial summary judgment against NEGT with respect to whether NEGT was a "joint employer" of the Claimants. Maryland courts "ha[ve] repeatedly recognized that, under certain circumstances, a person performing a given function simultaneously may be the employee of two performers." *Mackall v. Zayre Corp.*, 293 Md. 221, 443 A.2d 98, 102 (1982). "The test for determining whether dual employment exists is whether 'there is evidence to support an *inference* that more than one individual or company controls or directs a person in the performance of a given function.'" *Auto. Trade Ass'n of Md. v. Harold Folk Enterprises, Inc.*, 301 Md. 642, 484 A.2d 612, 621 (1984) (quoting *Mackall*, 443 A.2d at 103) (emphasis supplied by the court in *Automobile Trade Association* ). The "decisive test" is whether the alleged employer has the right "to control and direct the employee in the performance of the work and in the manner in which the work is to be done." *Id.*

 Courts look to the following criteria as "indicia" of an employment relationship: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the

power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer." *Keitz v. Nat'l Paving and Contracting Co.*, 214 Md. 479, 134 A.2d 296, 301 (1957). "Of these five, control is paramount and, in most cases, decisive." *Great Atl. & Pac. Tea Co., Inc. v. Imbraguglio*, 346 Md. 573, 697 A.2d 885, 894 (1997); *see also Whitehead v. Safway Steel Products*, 304 Md. 67, 497 A.2d 803, 809 (1985) (" '[D]ecisive,' besides 'controlling,' means 'conclusive,' 'determinative,' and 'definitive.' "). "[I]t is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important." *Keitz*, 134 A.2d at 301 (emphasis in original).

NEGT argues that *Mackall* and its progeny do not control the outcome in this case because NEGT is the corporate parent of ETHC. It suggests that *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978 (4th Cir.1987), a Fourth Circuit case interpreting federal and Virginia law, pertains because *Johnson* involved a suit by employees against their employer and the employer's parent company. *Id.* at 979. The court finds no fault in NEGT's reliance on *Johnson* (though the court could hardly consider it more instructive on Maryland law than cases decided by the supreme authority on the law of that state; *i.e.*, the Maryland Court of Appeals), but it perceives no discrepancy between the ruling in that case and the standard for determining whether a dual employer relationship exists set forth in *Mackall*. To the contrary, the Fourth Circuit made

---

**35.** Counsel for Mirick argued in the course of that hearing that even if the bonuses in question were not initially wages, they somehow took on the character of wages once they were awarded. Counsel cited no relevant case law in support of this principle, and this

court has found nothing to support counsel's claim. Such precedent, if it exists, might serve as a basis for distinguishing the Deferred Compensation Claims from the 2002 Supplemental Bonus Claims.

quite clear that the "strong presumption" against finding a corporate parent liable for misdeeds committed by the corporate subsidiary against the subsidiary's employees does not arise in certain circumstances:

> In an employment context, the parent company can be the employer of a subsidiary's worker if it exercises excessive control in one of two ways. *First, the parent could control the employment practices and decisions of the subsidiary* .... Second, the parent might so dominate the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer.

*Id.* at 981 (emphasis added).

The first exception listed by the *Johnson* court is just a simplified version of Maryland's joint employment rule. *See id.* ("If the parent company hired and fired the subsidiary employees, routinely shifted them between the two companies, and supervised their daily operations, it would be hard to find that the parent was not their employer."). The second exception refers to the traditional circumstances warranting a piercing of the corporate veil—circumstances that Hoffman and Vallieres do not allege, much less support with evidence, in this case.[36] Neither exception contradicts *Mackall's* formulation of the joint-employer test, and nothing in *Johnson* undermines the application of that test to NEGT in this case.

### 2. *Application of governing standard*

As noted above, Maryland courts consider five different factors in determin-

ing whether an employer-employee relationship exists, but "[t]hese factors are relevant [only] to the extent that the right of overall control is implicit in each," *Kersten v. Van Grack, Axelson & Williamowsky, P.C.*, 92 Md.App. 466, 608 A.2d 1270, 1272–73 (1992), and "the factor of control stands out as the most important." *Whitehead*, 497 A.2d at 809. In this case, there is a genuine dispute of material fact as to whether NEGT controlled the conduct of ETHC's employees. For that reason alone, summary judgment must be denied.[37]

Hoffman and Vallieres argue that NEGT controlled their conduct in three ways. First, they point to evidence demonstrating that their supervisors, Sarah Barpoulis and Lyn Maddox, were NEGT employees (*see* Hoffman/Vallieres Ex. 4; Maddox Depo. Tr. 306:6–25, 307:5–8; Barpoulis Depo. Tr. 14:2–15:15; Barron Depo. Tr. II 13:13–22; App. B–3 at 34, B–4 at 32–33). Second, they argue that NEGT controlled their behavior through its personnel and compensation policies (including the STIP) (*see* Hoffman/Vallieres Exs. 4, 6–18, 20–22; Barpoulis Depo. Tr. 66:1–68:18, Barron Depo. Tr. I 120:10, Barron Depo. Tr. II 263:9–16, 267:4–5, 268:18–269:12, 274:2–276:13, 279:20–281:22, 283:18–285:19, 293:6–296:14, 336:11–337:1, 338:9; App. B–2 at 3–4, 7–12, B–3 at 11–12, 15–16, 24, B–4 at 10–12, 14–17, 22, B–7 ¶¶ 5–11). Finally, they claim that NEGT controlled their daily activities, as evidenced by NEGT's decision to have ETHC "wind down" its trading operations in the fall of 2002 (*see* Hoffman/Vallieres Ex. 18;

---

**36.** Hoffman and Vallieres state unequivocally that they do not seek to pierce the corporate veil in their reply in support of their joint motion (Hoffman/Vallieres Reply at 1).

**37.** The court does not intend to suggest that the other factors listed in *Mackall* and its

progeny are irrelevant with respect to the issue of joint employment; it simply declines to render what would essentially be an advisory opinion with respect to those factors given the material dispute over the fundamental issue of employee control.

Barpoulis Depo. Tr. 66:1–68:18; App. B–2 at 7–12, B–3 at 24, B–4 at 22, B–7 ¶ 6).

■■■ Hoffman and Vallieres have amassed considerable evidence to support their assertions, but the assertions themselves do not support an inference of control over the day-to-day activities of ETHC's personnel when viewed in light of the contrary evidence presented by NEGT, and in some instances do not support an inference of control even viewed in a vacuum. For example, Hoffman and Vallieres demonstrate that ETHC executives Sarah Barpoulis and Lyn Maddox were officers at both ETHC and NEGT, but "courts generally presume 'that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary.'" *United States v. Bestfoods*, 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (quoting P. Blumberg, *Law of Corporate Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations* § 1.02.1 at 12 (1983)). Hoffman and Vallieres identify no evidence rebutting that presumption. Similarly, facts supporting the notion that NEGT directed overall corporate policy to ETHC (including the decision to "wind down" ETHC's books in the fall of 2002) do not show the requisite control over ETHC's employees, but rather indicate that NEGT utilized the kind of general control over the operations of its subsidiary that any owner is entitled to exercise. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Associates*, 336 Md. 635, 650 A.2d 260, 272 (1994) ("A parent corporation is generally justified in requiring its subsidiary to modify economic arrangements, contractual or otherwise, if those arrangements do not benefit the parent.").

The only evidence supporting the notion that NEGT controlled the daily activities of ETHC's employees is the plethora of documents referring to NEGT instead of ETHC as the employer of ETHC's personnel, most of which appear to be products of NEGT's human resources department (Hoffman/Vallieres Exs. 6–12, 20–22). But NEGT has produced evidence indicating that ETHC *paid* NEGT to use its human resources department as a cost-cutting move, which would resolve much of the confusion as to why ETHC employees would receive letters and forms emblazoned with NEGT's name and letterhead (Andre Aff. ¶ 13). Moreover, NEGT human resources director Erin Andre states in her May 6, 2006 affidavit that "ETHC, not NEGT, exercised control over the daily activities of its traders and employees" (*id.* at ¶ 11), and that "NEGT did not issue specific directives to ETHC's traders regarding their day-to-day trading decisions and activities" (*id.*). She states unequivocally that "[o]n a day-to-day basis, Mr. Vallieres and Mr. Hoffman were reviewed by, promoted by, disciplined by, and directed by other ETHC personnel" (*id.* at ¶ 33), and that "each NEGT subsidiary remained its own separate business with command over its own employees and day-to-day functions" (*id.* at ¶ 10).[38]

In short, there is at least a genuine dispute of material fact as to whether NEGT exercised any control over the day-to-day activities of ETHC's personnel, and consequently no way for the court to grant summary judgment in favor of Hoffman and Vallieres. This issue, like most of the issues raised in this case, must await trial.

---

**38.** In addition to Erin Andre's affidavit, Sarah Barpoulis testified in her deposition that she allocated the value at risk ("VaR") delegated by NEGT to ETHC to individual ETHC traders for use in making their deals (Barpoulis Depo. Tr. 32:12–33:20). In other words, ETHC management controlled the primary determinant in the day-to-day activities of ETHC traders through its internal allocation of VaR.

## III

For the reasons set forth above, the court will enter an order granting in part and denying in part the Objecting Debtors' motion for summary judgment, denying the motion for partial summary judgment filed by the Claimants, and denying the separate motion for partial summary judgment filed by Hoffman and Vallieres. The court will enter a separate order to show cause concerning the Claimants' request for treble damages on their Deferred Compensation Claims.

Several orders follow.

*ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT, DENYING CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT, AND GRANTING RELATED RELIEF*

Pursuant to a decision entered this same date, it is

ORDERED that the Debtors' Motion for Summary Judgment (D.E. No. 3682, filed May 1, 2006) is GRANTED in part and DENIED in part; and it is further

ORDERED that the Joint Motion of Claimants Adam Mirick, Adam Hoffman and Benoit Vallieres for Partial Summary Judgment Against Debtor PG & E Energy Trading Holdings Corporation and/or Debtor National Energy & Gas Transmission, Inc. (D.E. No. 3683, filed May 1, 2006) is DENIED; and it is further

ORDERED that Claimants Benoit Vallieres' and Adam Hoffman's Joint Motion for Partial Summary Judgment Against Debtors National Energy Gas and Transmission and PG & E Energy Trading Holdings Corporation (D.E. No. 3684, filed May 1, 2006) is DENIED; and it is further

ORDERED that the Objection to Allowance of Certain Claims of Adam Hoffman filed by the debtors National Energy & Gas Transmission, Inc. ("NEGT") and NEGT Energy Trading Holdings Corporation ("ETHC") (D.E. No. 1700, filed June 15, 2004) is SUSTAINED in part, and that Proofs of Claim Nos. 102 and 103 are DISALLOWED insofar as they assert a right to treble damages under the Maryland Wage Payment and Collection Law, Md.Code of Labor and Employment § 3–501 *et seq.* (1999 ed.) (the "Maryland Wage Act"), for the amounts owed him for certain bonuses denied the claimants Adam Mirick, Adam Hoffman, and Benoit Vallieres (the "Claimants") in 2003 for work performed in 2002 (the "2002 Supplemental Bonuses"), and insofar as they assert claims for the 2002 Supplemental Bonuses on the theories of unjust enrichment, constructive trust, fraudulent conveyance, and novation; and it is further

ORDERED the Objection to Allowance of Claim Filed by Benoit Vallieres filed by the debtors NEGT and ETHC (D.E. No. 2184, filed October 7, 2004) is SUSTAINED in part, and that Proof of Claim No. 214 is DISALLOWED insofar as it asserts a right to treble damages under the Maryland Wage Act for the amounts owed him for the unpaid 2002 Supplemental Bonuses, and insofar as it asserts a claim for the amounts owed him for the unpaid 2002 Supplemental Bonuses on the theories of unjust enrichment, constructive trust, and fraudulent conveyance; and it is further

ORDERED that the Objection to Allowance of Claim Filed by Adam Mirick filed by the debtors NEGT and ETHC (D.E. No. 2182, filed October 7, 2006) is SUSTAINED in part, and that Proof of Claim No. 77 is DISALLOWED insofar as it asserts a right to treble damages under the Maryland Wage Act for the amounts

owed him for the unpaid 2002 Supplemental Bonuses, and insofar as it asserts a claim for the 2002 Supplemental Bonuses on the theories of unjust enrichment, constructive trust, and fraudulent conveyance.